### LYKES BROS. S. S. CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9926.

Circuit Court of Appeals, Fifth Circuit.

March 20, 1942.

Donald V. Hunter, of Washington, D. C., for petitioner.

Joseph M. Jones, J. Louis Monarch, Sewall Key, and Helen R. Carloss, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Charles E. Lowery, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before FOSTER, SIBLEY, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The sole question here is whether taxpayer's income from carrying United States mails is to be reduced by certain annual deposits to a special bank account. The petitioner, Lykes Bros. Steamship Co., in the early part of 1933 was operating fifty-two ships belonging to the United States over routes which were unprofitable. Negotiations with the Interdepartmental Committee which embraced a member of the United States Shipping Board and a representative of the Postoffice Department, led to the making of a contract between the Company and the United States, acting through the Shipping Board, by which the Company was to buy the ships at a price of $2,461,790, payable in annual installments; and was to spend over a period of ten years $20,000,000 in new ships or reconditioning old ones, and for the latter use was by April 13 each year for nine years to make special deposits in bank of $100,000 the first year, $150,000 the second year, and increasing $50,000 each year till $2,700,000 should have been deposited. This contract was not to be effective unless a contemplated contract for carrying mails should be awarded the Company; and the special deposits were to cease if the mail contract should be cancelled without the Company's fault, and similar results should follow a failure by Congress in any year to appropriate funds for the mail carriage. The mail carriage was four days later awarded the Company, and a contract made with the Company by the United States, through the Postmaster General, by which the Company was to carry mail over the same routes on which the ships had previously been operated, but the pay was to be based on the mileage traversed and not on the amount of mail carried. The pay amounted to $2,279,988 in 1934, and $2,176,729 in 1935, though the mail actually carried was negligible. This contract likewise required the expenditure, during the ten years it was to run, of $20,000,000 for new ships or improving old ones, but did not refer to the special deposits. A few weeks later the United States, through the Shipping Board, and the Company made a contract with Whitney National Bank for handling the special deposits, the Bank agreeing to pay interest on them to the Company, but to pay out the principal only on the order of the Board for buying or remodeling ships, and other like things, following the language of the ship purchase contract on this subject. During the years 1933, 1934 and 1935 the ships were run over the routes specified on the contracts, the mail carriage was paid for as earned, and on April 11, 1934, at the end of the first year of operation $100,000 was put in the special deposit, and on April 13, 1935, at the end of the second year of operation $150,000 was added, according to contract. In the tax years 1934 and 1935 the Company reported as earnings all it received under the mail contract except the $100,000 and $150,000 so deposited. Those sums it claimed were paid to it by the United States as a contribution to capital and so were not taxable income according to the decision in Edwards v. Cuba Railroad Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124; or in any case they were so fettered by its obligation to invest them in ships that they were not income realized under Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. The Commissioner held them to be taxable as income, and the Board of Tax Appeals upheld him.

It is conceded that the plan of paying per mile travelled instead of according to weight of mail carried was intended as a subsidy to encourage the operation of ships over the designated routes and as a part of a plan to build up the merchant marine. The cheap price at which the ships were sold and the requirement in both contracts that the Steamship Company should within ten years spend $20,000,000 on new ships and reconditioning old ones had the same object. The contracts of purchase and for mail carriage contain provisions which make the continuance of one dependent on the other, but they are not one contract. The requirements of one are not imported into the other. They were made on different days and by different officials, and each speaks for itself. After both were made there was correspondence between the Postmaster General and the Chairman of the Shipping Board which is relied on to show that those officers thought the Postmaster General was concerned in the special deposits required by the purchase contract. The result of the correspondence was to cancel and terminate any such concern. The Steamship Company was no party to the correspondence, and it could have no effect upon the meaning or effect of either contract.

We are of opinion that what was to be paid, and was paid, under the mail carriage contract, though in character a subsidy, was paid for the services rendered under that contract. It was all income. None of it was required to be put in a special deposit or used for any special purpose. The Steamship Company agreed to spend $6,000,000 of the total $20,000,000 during the first five years in new ships or on the old ones, but this might be done all in the fifth year, and with funds from any source. It may be true, as it is argued, that the Steamship Company was operating these ships at a loss, aside from the mail carriage contract, and could not well spend the required amounts on ships except by using the mail funds; but it is also true that no such use of them was required by either contract. The mail payments could be used in any way the Company wished. It could, if it preferred, have borrowed the money to build ships.

It did in fact keep the mail carriage money in a separate account, and did in fact at the end of each year make the required special deposits from this separate account. But since no contract required it, no legal consequences follow. We agree with the Board that the entire sums paid for mail carriage were income. No part of them can be identified as a contribution to capital under Edwards v. Cuba Railroad Co., supra. No part was so earmarked or fettered as not to have been really received as income, under the definitions in Eisner v. Macomber, supra.

Affirmed.