**MARYLAND JOCKEY CLUB OF BALTIMORE CITY**

v.

**UNITED STATES.**

**Civ. No. 5966.**

United States District Court,
D. Maryland.

Oct. 20, 1953.

Semmes, Bowen & Semmes, Richard W. Case and Lawrence Perin, Baltimore, Md., for plaintiff.

Bernard J. Flynn, U. S. Atty., and Paul C. Wolman, Jr., Asst. U. S. Atty., Baltimore, Md., for United States.

WILLIAM C. COLEMAN, Chief Judge.

The question presented for decision is: did the $75,608.66 which was received by the plaintiff on November 29, 1948, from the Maryland State Racing Commission as a reimbursement of the cost of rebuilding plaintiff's racing strip at Pimlico Race Course, Baltimore, constitute income subject to federal income tax?

In its income tax return for the fiscal year ending November 30, 1948, plaintiff included this sum as gross income representing "withdrawal from Maryland Racing Commission Fund", but subsequently asserted that this was an error and thereupon filed a claim for refund of tax resulting therefrom in the amount of $28,731.29, and interest, which the Commissioner rejected. The present suit is for refund of this tax so assessed.

The payment in question to the plaintiff was made pursuant to two Acts of the Maryland Legislature, only the parts pertinent to the present issue being quoted. The first is Section 11 of Chapter 3, Laws of Maryland, Extraordinary Session, 1946, as follows: "Said Racing Commission (Maryland Racing Commission) shall have full power to prescribe rules, regulations and conditions under which all horse races shall be conducted within the State of Maryland. Said Commission may make rules governing, restricting or regulating betting on such races and may fix, regulate and condition the rate of charge by the licensee for admission, or for the performance of any service, or for the sale of any article on the premises of such licensee, and may regulate the size of the purse, stake or reward to be offered for the conduct of such races. Each licensee may deduct and retain for its own account one-half (½) of the breakage computed to the 10¢ and 6% of the mutuel pool, including any deduction required by the Commission as its agent pursuant to the provisions of Section 11A of this Article but exclusive of the 4% State tax imposed by Section 13 of this Article. All contracts and agreements for the payment of money and all salaries, fees and compensation paid by any person or persons, association or corporation licensed as hereinbefore provided, and all proposed extensions, additions, or improvements to the buildings, stables, improvements or tracks upon property owned or leased by such licensee shall be subject to the approval of the Commission. * * *."

The second is section 11A of Chapter 502, Laws of Maryland, 1947, the pertinent parts of which are as follows: "For the calendar year 1947 and for each year thereafter, each licensee shall, as the agent of the Racing Commission, deduct one-half of one per centum of the total amount of money wagered on all races during each and every meeting and remit such deduction to the Commission. All such deductions shall be held in and comprise a fund to be known as the 'Racing Fund,' and shall be deposited by the Commission in one or more banks or trust companies in the State. The members of the Commission shall have no personal liability for loss to such Fund by reason of the failure or insolvency or other fault of any depository if they shall use ordinary care in the selection of the depository. The Commission shall require any depository to secure by collateral any deposit therein comprising a part or all of the Fund.

"The amount of the Racing Fund on hand at any time, representing the deductions made by any particular licensee from the mutual pool, previously collected by such licensee, as agent of the Commission, may, with the prior written and express permission of the Commission, upon such terms and conditions as it may prescribe, be expended by that particular licensee for any substantial alterations, additions, changes, improvements, or repairs to or upon the property owned or leased by such licensee, and by it used for the conduct of racing. In determining whether to permit the use of any of the Racing Fund, the Commission shall give due consideration to whether its expenditure in each instance will promote the safety, convenience and comfort of the racing public and of horse owners and, generally, whether it will tend towards the improvement of racing in the State. If the deductions, herein provided for, made by any licensee for any calendar year, as agent of the Commission, shall neither have been spent nor binding commitments have been entered into for their expenditure, with the approval of the Commission, within three (3) years from the last day of the year of collection, the unspent portion of such year's deduction shall revert to the State as part of its general funds, and shall be paid over promptly by the Commission to the Comptroller. * * *"

Both of these enactments, with some later amendments, are presently codified as Sections 11 and 12 of Article 78B of the Annotated Code of Maryland, 1951. These enactments followed a

series of resolutions passed by the Racing Commission which, in turn, were based upon two main circumstances: (1) the Commission felt it desirable to inquire particularly into just how the various tracks in Maryland were spending the funds that had been allotted to them; and (2) the tracks, in turn, wanted greater allowances. It is not necessary to give the full, chronological history of the action taken by the Racing Commission leading up to the establishment of the Racing Fund referred to in the second of the two enactments just quoted. Suffice it to quote merely the following resolution of the Maryland Racing Commission, passed on April 29, 1944, as follows: *"Be it resolved* that the Commission's Resolution of July 5, 1938, authorizing a 1% additional take by the four major Racing Associations, be, and the same are hereby rescinded.

*"Be it resolved* that, effective April 12, and thereafter, the four Mile Racing Associations of Maryland be, and they are hereby authorized to take an additional ½% of the mutuel pool, provided that said additional amount be used towards the payment of the increase in the average daily purse over and above the amount of the average daily purses paid by each of said tracks, respectively, in 1937. The allowance of this ½% additional take and its application to the payment of purse increases shall be subject to change or repeal by the Commission at any time, but shall continue in effect until further order of the Commission.

*"Be it resolved* that, effective as of April 12, 1944, and thereafter, until the further order of the Commission, each of the four Mile Racing Associations, at any meet which they shall respectively hold, shall as agents, collect for the Maryland Racing Commission an additional ½% of the mutuel pool, and shall deposit such additional ½% daily as agents, to the order of the Maryland Racing Commission, in such depository or depositories as may, from time to time, be designated by the Commission.

*"Be it further resolved* that, the ½% additional take so collected by the tracks as agents for the Commission, shall be held by the Maryland Racing Commission until the 1945 Regular Session of the General Assembly of Maryland shall authorize the disposition under the supervision of the Maryland Racing Commission, of said funds so collected."

As a result of this action by the Racing Commission, the General Assembly of Maryland in 1945 enacted legislation consonant therewith which, with amendments, became the enactments which we have heretofore quoted. See Laws of Maryland 1945, Chapter 961, Sections 11 and 11A. By this legislation, 90 per cent of the money obtained by the tracks from betting was required to be held for the benefit of those who placed the bets; 5½ per cent of it was to go to the tracks; and four per cent as tax payable to the Racing Commission—a total of 99½ per cent. The balance of one-half per cent is the amount required to be deposited in the Racing Fund to the order of the Racing Commission.

As a result of damage caused by heavy rains to the racing strip at the Pimlico Course, plaintiff determined that it would be necessary to make capital expenditures to rebuild the strip. On July 28, 1948, plaintiff so notified the Maryland Racing Commission, and on August 31, 1948, the President and Secretary of the plaintiff appeared before the Commission, and the latter's minutes show that the request of the plaintiff to rebuild the strip at an estimated cost of $70,000 was approved, "payment to be made from the Racing Fund after the work has been completed and bills have been presented to the Commission and approved." The work was completed before the end of the plaintiff's fiscal year (November 30, 1948), and before that time plaintiff received from the Maryland Racing Commission a check for $75,608.66 as reimbursement for its expenditures for the work, pursuant to bills, invoices and receipts showing plaintiff's payment of same, all of which had

been submitted to the Commission. This reimbursement to plaintiff was made by the Commission out of funds which had been deducted from money wagered at Pimlico and remitted by the plaintiff to the Commission, and which the Commission deposited in the Racing Fund as required by law, as hereinbefore set forth.

This was the first payment that had ever been made to plaintiff as reimbursement out of any funds that it had deducted from money wagered at Pimlico and had deposited in the Racing Fund. The expenses of rebuilding the racing strip were capitalized on plaintiff's books in the fiscal year ending November 30, 1948; they were added to plaintiff's base for depreciation on its capital assets, and plaintiff claimed, and was allowed depreciation for federal and state income tax purposes on its fixed assets in the fiscal year ended November 30, 1949, and in subsequent years on the increased basis of its assets, determined by including this sum of $75,608.66. Plaintiff realized net taxable income in all of the fiscal years ended November 30, 1949, 1950, 1951 and 1952.

It is the contention of the taxpayer plaintiff that this $75,608.66 which it received from the Commission as reimbursement out of the Racing Fund for what it expended in track improvements, was not and never had been income of the plaintiff, because plaintiff never acquired title to it; that it possessed and handled it solely as agent for the Commission, and that, therefore, when any part of it was returned to the track,—as in the present case,—for capital expenditures, it never changed its character so as to become income of the track.

On the other hand, the Government contends that the money was merely trusteed; that it was originally the track's money, because it had its source in the business of the track; it resulted from the operation of the track, and was part of the money taken in at the track; that the State of Maryland had no title to, or right in the money unless and until after three years from the date of its

collection it was not repaid by the Commission to the track for capital or other improvements; that such use represented a benefit to the taxpayer, since it released taxpayer's other funds for operating purposes, and increased the taxpayer's basis for depreciation of fixed assets and for invested capital for excess profits purposes, from which the track gets a benefit.

The Sixteenth Amendment to the Federal Constitution provides that "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several states, and without regard to any census or enumeration".

Internal Revenue Code, Section 22(a), 26 U.S.C.A. § 22(a), in so far as pertinent to the question here in issue, provides as follows: General Definition,— "'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * *"

There appears to be no reported decision on facts closely akin to those in the present case. However, we believe that the situation presented in the case of Edwards v. Cuba R. Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, is sufficiently similar to make that decision controlling here. There, money subsidies were granted by the Cuban Government to a railroad company to promote construction of railroads in Cuba; in consideration also of reduced rates to the public as well as reduced rates and other privileges for the Government, these subsidies being fixed and paid proportionately to mileage actually constructed, and were used for capital expenditures by the Company, though not entered on

its books as in reduction of cost of construction. This subsidy payment, the Supreme Court held, did not constitute taxable income under the Sixteenth Amendment.

The gist of the Court's opinion, by Justice Butler, is embodied in the following part of it, 268 U.S. at pages 632–633, 45 S.Ct. at page 615, 69 L.Ed. 1124; "The subsidy payments were proportionate to mileage completed; and this indicates a purpose to reimburse plaintiff for capital expenditures. All—the physical properties and the money subsidies —were given for the same purposes. It cannot reasonably be held that one was contribution to capital assets, and that the other was profit, gain or income. Neither the laws nor the contracts indicate that the money subsidies were to be used for the payment of dividends, interest or anything else properly chargeable to or payable out of earnings or income. The subsidy payments taxed were not made for services rendered or to be rendered. They were not profits or gains from the use or operation of the railroad, and do not constitute income within the meaning of the Sixteenth Amendment. * * *."

There is, of course, a factual difference in the Edwards case, but that factual difference is not sufficient to require a different conclusion. Section 22(a) of the Internal Revenue Code, which defined "gross income" in 1948, was not broader in scope than the corresponding statutory provisions of the federal tax laws of 1909 and 1913 that were applicable to the Edwards case. It is true that the payments involved in the Edwards case were not made out of money earned in the taxpayer's business but were payments from general funds of the Republic of Cuba, as a subsidy to promote the construction of a railroad; whereas, in the present case, the reimbursement to the taxpayer was made out of funds originally derived from the taxpayer's business. However, the taxpayer never acquired title to these funds, nor could it ever use them in any way until the Commission turned them over to it to be used exclusively as the Commission designated. By the very wording of the Maryland statute which provides what shall be done with them, it is required that the taxpayer "shall, as the agent of the Racing Commission, deduct" them "and remit such deduction to the Commission." This is precisely what was done in the present case. It is significant that two Attorney Generals of Maryland have placed this same construction upon money in the Racing Fund,—once in ruling that such money is not subject to the Maryland 15% tax on "the net revenue" of each race-track; and again in ruling that such money could not be used to reimburse racetracks for plant improvements until the Racing Commission had first given its approval of the expenditures for which reimbursement is sought. See 29 Opinions of the Attorney General of Maryland 145; 35 Ibid. 257.

The Government relies largely upon Lykes Bros. Steamship Co. v. Commissioner, 126 F.2d 725, a decision of the 5th Circuit Court of Appeals, and Baboquivari Cattle Co. v. Commissioner, 135 F.2d 114, a decision of the 9th Circuit Court of Appeals. In the first of these cases a Steamship Company was free to use as it saw fit moneys received under a mail carriage contract in the nature of a subsidy. The Court held that the fact that the company was required to make annual payments into a fund, in connection with its agreement with the Shipping Board and the Postmaster General to spend some $20,000,000 on new ships, or in the reconditioning of old ones, did not entitle the company to reduce its reported income received under the mail carriage contract by the amount of such annual deposits. The Court said, 126 F.2d at page 727: "It (the steamship company) did in fact keep the mail carriage money in a separate account, and did in fact at the end of each year make the required special deposits from this separate account. But since no contract required it, no legal consequences follow. We agree with the Board that the entire sums paid for mail

carriage were income. No part of them can be identified as a contribution to capital under Edwards v. Cuba Railroad Co., supra. No part was so earmarked or fettered as not to have been really received as income, under the definitions in Eisner v. Macomber, supra [252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521]." This is a very concise statement of the distinction which we believe is properly drawn between the Edwards case, supra, and the Lykes Bros. case on the facts.

Turning to the case of Baboquivari Cattle Co. v. Commissioner, there, money was involved that had been received by a cattle company in certain years from the Federal Government under the Soil Conservation and Domestic Allotment Act for improvements, and the Court held that these moneys were taxable as income, and not as gifts, under the Revenue Act of 1936; the Soil Conservation and Domestic Allotment Act, 1935, 16 U.S.C.A. § 590a et seq.; and the Taylor Grazing Act, 45 U.S.C.A. § 315 et seq. The Court said, 135 F.2d at pages 115–116: "It is plain that the moneys received were not exempt as gifts under Section 22(b) (3) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Acts, page 825; they were earned payments made upon a consideration. On oral argument petitioner did not seriously contend that they were gifts. Its contention, in summary, is that the payments were not income at all, but capital subsidies. The taxpayer attempts to distinguish between types of payments made under the Act, those for inaction—as for refraining from production or for producing a limited amount only of a given crop—being said by petitioner to be classifiable as 'income subsidies' because designed to supplement income; whereas subsidies for positive outlays such as those made here are said, on the authority of Edwards v. Cuba Railroad Co., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124, to be classifiable as 'capital subsidies.'

\* \* \* \* \*

"It is of little importance, we think, what name be applied to the payments, whether they be called 'subsidies' as insisted upon by the taxpayer, or 'benefits' as they were termed by the Board. In either event they are within the broad concept of income as that term is defined in § 22(a) of the 1936 Act. Consult Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. No part of the sums paid to the petitioner were required to be placed by him in a particular account or fund. The payments were not earmarked, nor was there any restriction on their use. Petitioner was free to use the money for any purpose it might see fit, as to defray operating expenses or to pay dividends or to purchase an automobile. Obviously, the manner in which the taxpayer entered the items on its books is of no moment.

\* \* \* \* \*

"We think the case of Edwards v. Cuba Railroad Co., supra, is distinguished by what has been said. The situation here is more nearly like those involved in Texas & Pacific R. Co. v. United States, 286 U.S. 285, 52 S.Ct. 528, 76 L.Ed. 1108; Helvering v. Claiborne-Annapolis Ferry Co., 4 Cir., 93 F.2d 875; and Lykes Bros. S. S. Co. v. Commissioner [of Internal Revenue], 5 Cir., 126 F.2d 725, where analogous governmental payments were held to be taxable income."

In Helvering v. Claiborne-Annapolis Ferry Company, 93 F.2d 875, a decision of the Court of Appeals of this Circuit, the taxpayer was operating a ferry across Chesapeake Bay and received from the State of Maryland for the maintenance of the ferry during the year 1931 the sum of $23,000 or $1,000 a mile. The money was so used, and was not segregated from other income. The Board of Tax Appeals held that it was not income, but a contribution to capital by the State to encourage a ferry service in the public interest. But the Court of Appeals reversed. Judge Parker, in the Court's opinion, said, 93 F.2d 876–877: "On the first question, we think that the amount received by taxpayer from the state was clearly income as distinguished from contribution to capital. It was paid to the taxpayer by the state

in consideration of the maintenance of the ferry and was as truly earned by the operation of that enterprise as were the tolls collected from vehicles and passengers. It was used like other income for operating expenses and the accumulation of a fund from which dividends should be paid; and no part of it, so far as the record shows, went into invested capital of the enterprise.  *  *  *

\*     \*     \*     \*     \*

"And it is equally clear that the amount paid by the state was not intended by anyone as a contribution towards or an addition to the capital investment of the taxpayer. Taxpayer's capital was invested in wharves and ferryboats; and the payment by the state was intended, not to reimburse taxpayer for expenditures it had made' in their purchase or equipment, but to compensate it in part for their operation. As stated above, it was treated in all respects like other income and was available for operating expenses or for the payment of dividends. The case of Edwards v. Cuba Railroad Co., 268 U.S. 628, 45 S.Ct. 614, 615, 69 L.Ed. 1124, upon which taxpayer chiefly relies, is readily distinguishable. In that case the subsidy payments made by the Cuban government were used to reimburse taxpayer for capital expenditures.  *  *  * The subsidy paid taxpayer by the state of Maryland was more nearly analogous to the case of 'additional compensation' awarded the railroads by the government during the period of federal control, which has been held properly taxable as income of the railroads. Southern R. Co. v. Commissioner [of Internal Revenue], 4 Cir., 74 F.2d 887, 893, and cases there cited. Such 'additional compensation' was distinguished in those cases from the allowance made the railroads for undermaintenance, which, like the subsidy in the Cuba Railroad Case, was treated as a restoration of capital and not taxable as income."

We conclude that none of the three cases which we have last analysed are persuasive of a conclusion contrary to the one we reach, since they are factually distinguishable. The same is even more true of numerous other decisions which Government counsel have cited and which we therefore consider it unnecessary to analyse.

For the reasons set forth in this opinion, the plaintiff is entitled to refund from the Government of $28,731.29, with interest at 6%, as required by law, and judgment will be entered accordingly.