**MARYLAND JOCKEY CLUB OF BALTIMORE CITY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 9465.**

United States Court of Appeals Fourth Circuit.

Argued Sept. 29, 1964.

Decided Dec. 2, 1964.

Jacob Kartman, Baltimore, Md. (Kartman & Resnick, Baltimore, Md., on brief), for appellant.

Norman H. Wolfe, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Harry Marselli, Attys., Dept. of Justice, Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

Excess profits tax relief was denied the Maryland Jockey Club of Baltimore City, by the District Court, on moneys received in 1950 and 1953 from the Maryland Racing Commission, and on this appeal the taxpayer renews its assertion that the sums received in those years was "abnormal income" as defined and accorded advantages by section 456 of the Internal Revenue Code of 1939,

as amended.[1]  We think the taxpayer has sustained its position.

The relief given by the statute is the allocation of abnormal income received in one year to another year or years to which it is rightly ascribable.  Obviously, this spread of unusual income relieves the taxpayer from having income accumulated and heaped upon him for taxation in a single year, without his fault, when in part it was derived from other years.

Aside from the requirements that the income be abnormal in fact or in excess of 115% of the average income of the same class over the preceding four years, and attributable to other years, in order to obtain relief the receipts must be within the pertinent statutory definition of abnormal income:

"SEC. 456.  ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

"(a) *Definitions.*—For the purposes of this section—

"(1) *Abnormal income.*—The term 'abnormal income' means income of any class described in paragraph (2) * * *.

"(2) Separate Classes of Income.—Each of the following subparagraphs shall be held to describe a separate class of income:

"(A) Income arising out of a *claim,* award, judgment, or decree, or interest on any of the foregoing: * * *."  (Accent added)

The District Court's denial of relief upheld the Commissioner of Internal Revenue's determination—contrary to the taxpayer's contention—that the income in suit was not the result of a "claim" as required by the revenue law. Hence, whether the receipts arose out of a claim is the question decisive of this appeal.

The facts are not in dispute.  Taxpayer, a Maryland corporation, owns and operates the Pimlico Race Course in Baltimore under the license statutes of the State and subject to the control of the Maryland Racing Commission.  The lawful and normal income of the Club is derived from admissions, concessions, parking fees and a share of the pari-mutuel betting.

One-half of one per cent of the gross amounts received from the pari-mutuel betting has been annually paid to the Commission, since 1944, by the Club and other race track licensees pursuant to Commission regulations and State statute.[2]  These sums are placed in what is designated as the Racing Fund.  Generally, with the permission of the Commission and conditioned as it prescribes, this money may be applied by the Club, as a licensee, to substantial alterations, repairs or improvements to its racing installation.  On this head the Maryland statute stipulates that:

"The amount of the Racing Fund on hand at any time, representing the deductions [the moneys paid to the Commission] made by any particular licensee from the mutual pool, previously collected by such licensee, as agent of the Commission, may, *with the prior written and express permission of the Commission, upon such terms and conditions as it may prescribe,* be expended by that particular licensee for

1.  Chap. 1 of the 1939 Internal Revenue Code, section 456, [as added by § 101, Excess Profits Tax Act of 1950, c. 1199, 64 Stat. 1137]; 26 U.S.C. (1952 ed.) § 456.

2.  The statute applicable to the years in question was that of 1945 and that of 1947 as amended in 1951 and 1953.  The one controlling here is the 1947 Act, cited as sec. 11A of ch. 502, Laws of Maryland, 1947, codified as Art. 78B, sec. 12 of Flack's Anno.Code of Md., 1947 Cum.

For a comprehensive and helpful exposition of this statute and its antecedents, see Maryland Jockey Club of Baltimore City v. United States, 189 F.Supp. 70 (D.C.Md.1960), aff. 292 F. 2d 469 (4 Cir. 1961); Southern Maryland Agricultural Assn. v. United States, 126 F.Supp. 125 (D.C.Md.1954), aff. 227 F.2d 200 (4 Cir. 1955); United States v. Maryland Jockey Club, 210 F.2d 367 (4 Cir. 1954), reversing 118 F.Supp. 349 (D.C.Md.1953), cert. denied 347 U.S. 1014, 74 S.Ct. 869, 98 L.Ed. 1137.

any substantial alterations, additions, changes, improvements, or repairs to or upon the property owned or leased by such licensee, and by it used for the conduct of racing. *In determining whether to permit the use of any of the Racing Fund, the Commission shall give due consideration to whether its expenditure in each instance will promote the safety, convenience and comfort of the racing public and of horse owners and, generally, whether it will tend towards the improvement of racing in the State.* If the deductions, herein provided for, made by any licensee for any calendar year, as agent of the Commission, shall neither have been spent nor binding commitments have been entered into for their expenditure, with the approval of the Commission, within three (3) years from the last day of the year of collection, the unspent portion of such year's deduction shall revert to the State as part of its general funds, and shall be paid over promptly by the Commission to the Comptroller. Provided, however, that due to the present war emergency, such deductions of any licensee for the calendar years 1944, 1945 and 1946 may be expended or binding commitments entered into for its expenditure at any time prior to December 31, 1950." * * * (Accent added)

From 1944 through 1950 the payments into the Racing Fund by the taxpayer were these:

| Year | Amount |
| --- | --- |
| 1944 | $102,864.33 |
| 1945 | 115,156.52 |
| 1946 | 155,134.94 |
| 1947 | 137,220.76 |
| 1948 | 114,207.72 |
| 1949 | 97,134.25 |
| 1950 | 99,065.35 |
| | $820,783.87 |

A disbursement of $75,608.66 was received by the Club in 1948.

The taxpayer's balance in the Fund in 1950 thus was $745,175.21. The Club actually spent or became committed in 1950 for only $27,686.33 for improvements in that year. "It was unable", the District Court found, "to spend or commit the balance of $717,488.88 because of restrictions on construction imposed by the federal government as a result of the national emergency arising out of the Korean War". See order No. M–4 of the National Production Authority, United States Department of Commerce, dated October 27, 1950, 15 Fed.Reg. 6105 (1950).

Evidently to escape the Scylla of the Government regulatory freeze and the Charybdis of the Maryland statute— that any money in the Racing Fund not spent or obligated by the taxpayer within 3 years should revert to the State, except the contributions of 1944, 1945 and 1946 which might be held until December 31, 1950—taxpayer entered into "an irrevocable and binding commitment [with the Commission] for the expenditure of said $717,488.88 [the unobligated residue in the Fund available to the Club] upon the improvement" of the taxpayer's facilities at Pimlico in the future. Thereupon the Commission agreed that the taxpayer might receive its balance of the Fund upon giving a refunding bond conditioned upon the taxpayer's faithful performance of its commitment "within one (1) year after the repeal of Federal prohibitions * * *, or such additional period (not to exceed two years from such repeal) as may be allowed" by the Commission. Subsequently this arrangement was ratified by the Maryland Legislature.[3] Hence, in 1950 the taxpayer received its entire accumulated balance in the Fund— $27,686.33 spent plus $717,488.88 unspent, a total of $745,175.21.

3. Acts of 1953, ch. 422, now codified as Art. 78B, sec. 12(e) of Annotated Code of Maryland.

From 1951 through 1953 the taxpayer made these additional remittances to the Racing Fund:

| Year | Amount |
|---|---|
| 1951 | $ 63,312.55 |
| 1952 | 162,012.42 |
| 1953 (Spring) | 106,071.97 |
| | $331,396.94 |

Of this sum a distribution of $328,586.01 was made in 1953 [4] to the taxpayer, this amount having been expended or committed on improvements during 1953.

The Federal bar was not raised until July 1, 1953.

The Jockey Club paid the normal tax and surtax on the moneys received from the Racing Fund in 1950 and 1953. The Commissioner of Internal Revenue having denied the taxpayer's plea for relief, the Club also paid so much of the *excess profits taxes* as the Jockey Club would have been relieved of if it were entitled to the advantages conferred by § 456, I.R.C.1939 as amended. This suit was begun in the District Court to recover that amount. Its computation has, by stipulation, been left to the Commissioner subject to our ruling upon whether the 1950 and 1953 receipts of the taxpayer were statutory abnormal income.

Both of these receipts, we think, were "abnormal income". Each included items attributable to other taxable years. Moreover, they met the further statutory condition that they exceed 115% "of the average amount of the gross income of the same class for the four previous taxable years". Fulfillment of these two requirements is manifest from the tabulation herein of the payments made by the Club into the Fund during the period of 1944 through 1953. Finally, and pivotally, examination of the Maryland statute will establish that by its terms

disbursements to the taxpayer can be made only on a claim.

The State law does not let the Commission return any contribution to a licensee for expenditure merely for the asking. The "written and express permission of the Commission" must first be obtained. The Commission may prescribe "terms and conditions" for the expenditure of the moneys. "In determining whether to permit the use of any of the Racing Fund, the Commission shall give due consideration to whether its expenditure in each instance will promote the safety, convenience and comfort of the racing public and of horse owners and, generally, whether it will tend towards the improvement of racing in the State". A fair assumption is that the applicant has a burden of persuading the Commission that the expenditure proposed is within the statute and justifies release of the moneys. Plainly, the refund is not something of course, nor is it a perfunctory distribution. The application for it can be nothing less than a claim. When we recall, also, that although the desired moneys are its very own, yet they cannot be obtained by the taxpayer without the Commission's consent, United States v. Maryland Jockey Club, supra, 210 F.2d 367, the soundness of the conclusion that the funds can be reached only through the prosecution of a claim is starkly demonstrated.

The association of the word "claim" in § 456 with "award, judgment, or decree" does not suggest that adversity or dispute is an indispensable element of such a claim. The context of the term simply implies a stage of an asserted right, which may or may not later pass into arbitration or litigation. The only immediately vital constituent of a claim, as we see it, is that there be a reasonable and foreseeable possibility that a demand could be refused upon a non-frivolous ground. Such a possibility, as heretofore pointed out, is here present every year.

4. In 1951 the Maryland statute (1947) was amended to extend the time to March 31, 1953 for recovering any moneys previously contributed to and still held in the Racing Fund.

But aside from the nature of the taxpayer's right in any year to its portion of the Racing Fund, and regardless, too, of our definition of a claim, the process of negotiating and arriving at the agreement with the Commission in 1950, including the furnishing of a bond, certainly constituted the presentation of a claim in every sense of the word. If adversity was required, it was displayed in the Federal regulation, the State's threat of reverter and the Commission's insistence upon the agreement and a performance bond.

What has been said as to the character of the taxpayer's rights in 1950 and each of the prior years is apposite to 1951, 1952 and 1953. Furthermore, not until July 1, 1953 could the contributions of 1951, 1952 and the first half of 1953 be repossessed. Had a demand been made therefor before the expiration of the Government restriction on July 1, 1953 it would necessarily have been refused. Thus the Government itself prevented any casual reclamation. If needed for a claim, adversity was to be found in the Government regulation. If the stature of the Club's right was not a claim, it was nothing.

It is unimportant that in taxpayer's experience the Commission had never declined a request and had never allowed any moneys to forfeit to the State. Nor is the agreeableness or acquiescence of the Commission in the 1950 and 1953 disbursements of any consequence. It is not what the Commission has done, but what it lawfully may do, that determines the character of the assertion by a licensee of a right to the money, and the character of the right of the taxpayer to the money is the decisive factor presently. That right was fashioned primarily in the State statute as a claim, and has been unalterably confirmed in that character by the circumstances incident to the 1950 and 1953 disbursements.

For these reasons we think the taxpayer here should have the relief afforded in the excess profits statute. The judgment on review will be reversed and the action remanded to the District Court for proceedings not inconsistent with this opinion.

Reversed and remanded.