BABOQUIVARI CATTLE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 103848. Promulgated June 16, 1942.

*Lloyd Fletcher, Jr., Esq.,* and *John W. Townsend, Esq.,* for the petitioner.

*E. L. Corbin, Esq.,* for the respondent.

OPINION.

MELLOTT: The Commissioner made several adjustments to the net income shown by petitioner's returns for 1937 and 1938 and determined deficiencies in income tax in the respective amounts of $795.60 and $424.46. The sole error charged in the petition is the inclusion in gross income of $3,586.89 for 1937 and $3,247.74 for 1938, these being the amounts received from the United States under the Soil Conservation and Domestic Allotment Act.[1] All of the facts have been stipulated, admitted in the pleadings, or shown in documents received in evidence without objection and are found accordingly.

Petitioner, an Arizona corporation engaged in the operation of a cattle ranch and keeping its books upon the accrual basis, filed its returns with the collector of internal revenue for the district of Arizona. The ranch comprises 57,200 acres of land in Pima County, Arizona, 45,880+ being owned by the state, 4,000 by the United States and 7,319+ by petitioner. During the taxable years the land owned by the state was held by petitioner under grazing leases duly executed under the laws of Arizona for terms of from five to ten years and the land owned by the United States was held by petitioner under the provisions of the Taylor Grazing Act of June 28, 1934 (48 Stat. 1296), as amended. The land is in a hot, semiarid region in the watershed of the Gila River, a tributary of the Colorado River. The major portion of the rainfall occurs during three summer months and because of climatic and geographical conditions the lands owned or held by petitioner and surrounding lands are subject to substantial erosion.

During the taxable years petitioner constructed or rebuilt on the ranch some dirt reservoirs and earthen tanks, constructed a rubble masonry dam, built two miles of drift fence, deepened a well, and developed a spring or seep. Before these improvements were undertaken a range grazing examiner, working in conjunction with the

---

[1] Act of April 27, 1935 (49 Stat. 163), as amended by Act of February 29, 1936 (49 Stat. 1148).

Pima County Range Conservation Committee, had made a survey of petitioner's ranch and a report recommending that the improvements be made. The first report was approved by the committee on or about July 16, 1937. On that date the committee advised petitioner in writing: "Upon notification by you * * * that one or more of these recommended improvements have been completed, the County Committee will inspect same and upon approval, will submit to you an application to be signed for benefit payment." The letter also advised petitioner, in accordance with the Soil Conservation and Domestic Allotment Act, *supra*, and the regulations issued thereunder: [2] "Number of animal units 2325 which times $1.50 per head, will enable you to earn a maximum payment of $3,487.50." Substantially the same procedure was followed in 1938, the total allowance, computed upon the number of acres and number of animal units, being $3,247.74.

Upon completion of a portion of the work in 1937 the contemplated notification was given, application was filed and approved, and payment was authorized and made to petitioner in the amount of $3,586.89. Upon completion of the remainder of the work in 1938 payment was made in the amount of $3,247.74. The cost of the work in each year exceeded the amounts received by petitioner from the United States. In petitioner's books of account the cost of the improvements was not charged to profit and loss, but was treated as a capital item and carried into an asset account entitled "Improvements under Federal Aid." The amounts received by petitioner in the taxable years were treated as credits to capital surplus. In its returns of income the amounts were shown as carried upon petitioner's books; but neither was included in its gross income. The Commissioner added each of them to the net income reported.

All of the improvements in 1937 were made upon land owned by the State of Arizona and held by petitioner under lease. Of the total amount received by petitioner in 1938, $899.10 (in the language of the stipulation) "represented reimbursements or payments for improvements made on land owned outright by the petitioner, $2,348.64 on land owned by the State of Arizona, and none on land owned by the United States Government." While we have found all of the facts to be as stipulated, we think it is more accurate to say that benefit payments were received by petitioner in the amounts shown above for carrying out the range improvement practices recommended by the range examiner and approved by the Pima County Agricultural Conservation Association in accordance with the regulations prescribed by the Secretary of Agriculture under the Soil Conservation

---

[2] Western Region Bulletin No. 101, Arizona, Federal Register Feb. 26, 1937, p. 345; W. R. B. Arizona Supp. I, Federal Register, June 5, 1937, p. 1141; W. R. B. 101, Arizona Supp. II, Federal Register July 27, 1937, p. 1554.

and Domestic Allotment Act, *supra.* So much, then, for the basic facts.

The Act of April 27, 1935, (49 Stat. 163) directed the establishment of an agency in the Department of Agriculture to be known as the "Soil Conservation Service" and provided that the Secretary of Agriculture should assume all obligations incurred by the Soil Erosion Service prior to its transfer to the Department. Congress "recognized that the wastage of soil and moisture * * * resulting from soil erosion, is a menace to the national welfare" and declared its policy to be "to provide permanently for the control and prevention of soil erosion and thereby to preserve natural resources, control floods, prevent impairment of reservoirs, and maintain the navigability of rivers and harbors, protect public health, public lands and relieve unemployment * * *." It therefore authorized the Secretary of Agriculture to conduct surveys, investigations, and research relating to the character of soil erosion and the preventive measures needed, to carry out preventive measures, and:

(3) To cooperate or enter into agreements with, or to furnish financial or other aid to, any agency, governmental or otherwise, or any person, subject to such conditions as he may deem necessary, for the purposes of this Act.

As a condition to extending any benefits under the act to lands not owned by the United States the Secretary of Agriculture was authorized to require: (1) the enactment and reasonable safeguards for the enforcement of state and local laws imposing suitable permanent restrictions on the use of the lands and otherwise providing for the prevention of soil erosion; (2) agreements or covenants as to the permanent use of such lands; and (3) contributions in money, services, materials, or otherwise, to any operations conferring such benefits. He was also authorized to secure the cooperation of any governmental agency, to continue employees of the organization theretofore established for the purpose of administering the provisions of the act with relation to the prevention of soil erosion, and to expend the funds theretofore appropriated for such purpose.

The excerpts from the report of the Senate Committee on Agriculture and Forestry shown in the margin [3] indicate the magnitude of

---

[3] Recognizing that, unless soil erosion can be controlled on farm, grazing, and forest lands, the prosperity of the United States cannot be permanently maintained, the bill provides for the coordination of all Federal activities with relation to soil erosion.

Heretofore, soil-erosion control has been among several groups in the different Departments. The present bill coordinates all of these groups and places the control under the Secretary of Agriculture. Experiences of recent storms, both flood and wind, demonstrate the necessity to prevent wastage of soil, the conservation of water, and the control of floods. The silting of reservoirs, the maintaining of the navigability of rivers and harbors, the protection of public lands, all justify Federal responsibility for the carrying out of a national erosion-control program.

Vast areas of agricultural lands are threatened with abandonment and the occupants thereof are daily increasing the numbers on Federal relief rolls to the extent that this problem alone warrants an extensive Federal erosion-control program.

 * * * * * * *

the problem and the reason for the enactment of the legislation.

The Soil Conservation Act was amended February 29, 1936, by the addition of several new sections and it became the "Soil Conservation and Domestic Allotment Act." (49 Stat. 1148.) The most substantial change was through the addition of sections 7 and 8. Section 7, as explained in Report No. 1973 of the House Committee on Agriculture, 74th Cong., 2d sess., provided for Federal grants to the states to enable them to carry out plans developed by them to effectuate any one or more of the following purposes:

(1) Preservation and improvements of soil fertility;
(2) Promotion of the economic use of land;
(3) Diminution of exploitation and of unprofitable use of national soil resources;
(4) Provision for and maintenance of a continuous and stable supply of agricultural commodities adequate to meet domestic and foreign consumer requirements at prices fair to producers and consumers; and
(5) Reestablishment and maintenance of farmers' purchasing power.

Each state was left free to accept or refuse the benefits and it was contemplated that no citizen of a state should have any relation, contractual or otherwise, with the Federal Government.

As a temporary expediency the Secretary of Agriculture, under section 8, was given power to make payments of grants or other aid to agricultural producers determined by him to be fair and reasonable in connection with the effectuation of the purposes specified in section 7, measured by: (1) the treatment or use of their land or a part thereof for soil restoration, soil conservation or the prevention of erosion; (2) changes in the use of their land; (3) a percentage of

---

The aid authorized in this subsection will be necessary because, in general, the owner of private lands cannot bear the entire cost of controlling the erosion thereon. He has neither the technical knowledge nor the financial resources. Over tremendous areas, land destruction has proceeded to the point where it would be impossible to persuade or force the owners to assume the entire burden of control, nor would it be just to do so. Fundamentally, they have not been responsible for the erosion which has occurred. In the disposal of the public domain, settlers were encouraged to acquire the public lands and to cultivate them. With the transfer of ownership went no restrictions, instructions, or advice as to methods under which the land should be used in order to protect it from erosion.

Acting in good faith, the settlers used their land in the light of the best information available. Since it was not the initial fault of the settler that his land became subject to erosion, it would not be right to require him to bear the entire burden of repairing damage done or of preventing future damage. Furthermore, the interest of the Nation in controlling erosion far exceeds that of the private landowners. An individual may destroy his land, move away, obtain a position somewhere else, accumulate capital, and purchase new land. For the Nation, land destroyed is land gone forever. This drain on the national resource is not immediately fatal, but, if the destruction continues unchecked, the time will come when remaining land resources will be insufficient to support our population on an adequate standard of living. The cost to the Nation of such changes would be incalculable. Moreover, erosion directly threatens vast Federal investments in dams and channels and annually requires the expenditure of large sums for dredging operations. The only practical method of eliminating these hazards and costs is to control the erosion on private lands, and it would not be equitable to require the owner of these lands to make expenditures for the protection of Federal investments.

\* \* \* \* \* \* \*

their normal production of any one or more agricultural commodities designated by the Secretary equaling the percentage of the normal national production of such commodity or commodities required for domestic consumption; or (4) any combination of the above. In determining the amount of any payment or grant measured by (1) or (2) the Secretary was required to take into consideration the productivity of the land affected by the farming practices adopted during the year with respect to which the payment was made. He was authorized to utilize county and community committees of agricultural producers, the agricultural extension service, and other approved agencies in carrying out the provisions of the act, but he was specifically denied the power "to enter into any contract binding upon any producer or to acquire any land or any right or interest therein." In administering section 8 the Secretary was required in every practical way to encourage and provide for soil conserving and soil rebuilding practices rather than the growing of soil depleting commercial crops. To carry out the purposes of sections 7 and 8 there was authorized to be appropriated for any fiscal year an amount not in excess of $500,000,000.

Under date of January 14, 1937, the Secretary, pursuant to the authority vested in him under section 8 of the act promulgated regulations under which payments would be made to farmers, tenants, ranch operators, sharecroppers, etc., in the State of Arizona. A ranch operator was defined to be "a person who as owner, cash tenant, or share tenant operates or a person who acts in similar capacity in the operation of a ranching unit." A ranching unit was "all range land which is used by the ranch operator as a single unit in producing range live stock with farm machinery, work stock and labor, substantially separate from that of any other range land." A range building payment was stated to mean "a payment for the carrying out of approved range building practices" and a range building allowance was defined as "the largest amount for any ranching unit which may be earned as a range building payment on such ranching unit." Animal unit was defined as "one cow, one horse, 5 sheep, 5 goats or the equivalent thereof" and grazing capacity or range land was stated to mean "that number of animal units which such land will sustain on a twelve-month basis over a period of years without injury to the range forage, tree growth or watershed." (Western Region Bulletin, No. 101, Arizona, *supra*.)

Under part IV of the regulations the rates and conditions of range building payments were set out. As particularly applicable to the presently stipulated facts they were: 15 cents per cubic yard of fill or excavation for constructing earthen pits or reservoirs with adequate spillways; $1 per linear foot for drilling or digging a well; $50 for digging out a spring or seep and protecting the source from

trampling; 30 cents per rod for constructing cross fences or drift fences; and 3 cents per linear foot for the establishment of fire guards. Under section 2 of part IV of the regulations the range building allowance for any ranching unit was to be "equal to $1.50 times the grazing capacity of the range land in the ranching unit."

Application for range building payments could be made only by ranch operators and payments were to be made only upon application filed with the county committee. The grazing capacity for each ranching unit was to be established only upon a report submitted by the range examiner who, in examining the range and making his report thereon, was required to take into consideration: (a) composition, palatability, and density of growth; (b) climatic fluctuations; (c) distribution and character of watering facilities; (d) topographic and cultural features; (e) classes of live stock; (f) presence or absence of rodents and poisonous plant infestations; and (g) previous use.

The regulations were amended June 3, 1937 (W. R. B. No. 101, Arizona, Supplement I, *supra*), to provide that payment be made for carrying out on range land in 1937 such range building practices as were approved by the county committee for the ranching unit prior to their institution, provided the payments did not exceed the range building allowance for the ranching unit. They were further amended under date of July 23, 1937 (W. R. B. 101, Arizona, Supplement II, Federal Register, July 27, 1937, p. 1554), in particulars not presently important.

Rather extended reference has been made to the act and regulations under which the payments in issue were made for two reasons: First, because this is the first proceeding before the Board in which the taxability of such payments has been in issue; and second, because, notwithstanding the stipulation of the parties to the effect that the payments were "reimbursements or payments for improvements made on land owned outright by petitioner * * * or by the State of Arizona", we feel that they were nothing but benefit payments for carrying out approved range improvement practices recommended by the range examiner and approved by the county conservation committee. With this background and acting upon the assumption that our question is essentially whether benefit payments are income to the recipient, we give consideration to the several contentions made by petitioner upon brief, though not in the order presented by it.

May the payments be construed to be gifts and therefore exempt from taxation under section 22 (b) (3) of the Revenue Act of 1936? Petitioner urges that they should be, pointing out that the Secretary of Agriculture had no power under the act to "enter into any contract binding upon any producer", that the United States received no direct

consideration in goods or services for the payments made, and that the act itself refers to the payments as "grants." The only case cited is *United States* v. *Hurst*, 2 Fed. (2d) 73. In that case the United States District Court for the District of Wyoming followed *Union Oil Co.* v. *Smith*, 249 U. S. 337, which recognized that a locator and discoverer of mineral rights upon vacant lands of the United States had a possessory right in the land, capable of conveyance, inheritance or devise, and held that the acquisition of such a right under the United States statutes partook "more of the nature of a gift than that of any other method of acquiring title to property known to the law." It also held that if Congress had desired to exclude from its exemption of gifts any particular kind it would have so declared.

It may be assumed for present purposes that the conclusion of the Court was correct under the facts before it; but we do not believe that the payments now in issue can be construed to be gifts. Under the Soil Conservation and Domestic Allotment Act it was not intended that the Government should make "a voluntary transfer of real or personal property without any consideration", "a donation", "a present", or that it should "voluntarily bestow something of value without expectation of return." The very theory of the legislation was that the Government and the landowner or tenant should cooperate in preventing soil erosion, the Government intending, not to bind a landowner or tenant to *make* any particular improvement, but to give him a "benefit payment", if earned, after inspection of the completed work and signing of the required application. The fact that the work was required to be performed voluntarily and that the Secretary of Agriculture was without power to enter into any binding contracts with the owner or operator before the completion of the work, is not sufficient, in our judgment, to make the payments mere gifts. We hold, therefore, that the amounts in issue may not be excluded from gross income under section 22 (b) (3), *supra*.

The taxation of the payments to it, says the petitioner, would *pro tanto* reduce the benefits granted by the Soil Conservation and Domestic Allotment Act and thus defeat the very purpose of Congress. This, it contends, "argues strongly that the payments were not intended by Congress to be subject to taxation as income." The only cases cited in support of this contention are those holding that tax-imposing statutes are to be construed strictly against the Government and all doubt resolved in favor of the taxpayer. *Gould* v. *Gould*, 245 U. S. 151; *Crooks* v. *Harrelson*, 282 U. S. 55. In our judgment the cited cases are not applicable. Petitioner's assertion that this is a case where there is a presumption against the taxability of the amounts received is not supported by any authorities, nor does it point to any specific statute allowing an exemption from tax. The act under which the payments were made was passed while the income tax laws were in full force and

effect. It must be presumed that Congress was aware of their provisions. Since it did not see fit to incorporate in the act a provision exempting benefit payments, the conclusion that it intended them to be taxed is inescapable. Cf. *Pacific Co. Ltd.* v. *Johnson*, 285 U. S. 480; *Sun-Herald Corporation* v. *Duggan*, 73 Fed. (2d) 298; *United States* v. *Stewart*, 311 U. S. 60.

The briefs of the parties are largely devoted to a discussion of the rule enunciated by the Supreme Court in *Edwards* v. *Cuba Railroad Co.*, 268 U. S. 628, and its applicability to the stipulated facts. Stated generally, it is that a contribution to the capital assets of a railroad company in order to induce construction and operation of railroads for the service of the public, does not constitute income to the recipient within the meaning of the Sixteenth Amendment. The cited case has been followed many times by the courts and this Board. In *Liberty Light & Power Co.*, 4 B. T. A. 155, citizens of a community, desiring to obtain electric service, transferred to the taxpayer transmission lines which they had constructed. In *Texas & Pacific Railway Co.* v. *United States*, 52 Fed. (2d) 1040; affirmed on another issue, 286 U. S. 285, and *Kauai Railway Co., Ltd.*, 13 B. T. A. 686, contributions were made to railroad companies by business concerns for the construction of spur or side tracks and for other construction work. In *Chicago & Northwestern Railway Co.* v. *Commissioner*, 66 Fed. (2d) 61; certiorari denied, 290 U. S. 672, the taxpayer received an allowance from the Government for undermaintenance of its railroad during Federal control. In *Frank Holton & Co.*, 10 B. T. A. 1317, property to be used as a factory was conveyed to the taxpayer to induce it to locate in that city, and in *Arkansas Compress Co.*, 8 B. T. A. 155, contributions of land and cash were made to the taxpayer to induce it to erect and operate cotton compresses and warehouses. In each case it was held that the taxpayer was not in receipt of taxable income. See also *Great Northern Railway Co.*, 8 B. T. A. 225; affd., 40 Fed. (2d) 372; certiorari denied, 282 U. S. 855; *Baltimore & Ohio Railroad Co.*, 30 B. T. A. 194; *Decatur Water Supply Co.* v. *Commissioner*, 88 Fed. (2d) 341; *Valley Waste Disposal Co.*, 38 B. T. A. 452; and *Detroit Edison Co.*, 45 B. T. A. 358 (on appeal, C. C. A., 6th Cir.).

But while the rule of the cited case has been followed many times, it has been found to be inapplicable to many payments made by the sovereign to a taxpayer. The Court of Claims, in *Texas & Pacific Railway Co.* v. *United States*, *supra*, citing a number of cases decided by this Board in which it was held that amounts received by railroad companies under the provisions of the Transportation Act to make good an operating deficit for the six-month period after termination of Federal control were income (*Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233; affd., 293 U. S. 295, and others), came to the same conclusion, though the railroads were relying upon *Edwards* v.

*Cuba Railroad Co.* The Supreme Court affirmed, saying—"The sums * * * were not subsidies or gifts." *Texas & Pacific Railway Co.* v. *United States, supra.* See also *Continental Tie & Lumber Co.* v. *United States,* 286 U. S. 290. The amounts paid to railroad companies as just compensation for the taking and use of their properties during Federal control were also held to be income (*Kansas City Southern Railway Co.* v. *Commissioner,* 52 Fed. (2d) 372; certiorari denied, 284 U. S. 676, affirming on this point 16 B. T. A. 665), although the taxpayers relied upon the rule of the *Cuba Railroad Co.* case. In *Burke-Divide Oil Co.* v. *Neal,* 73 Fed. (2d) 857; certiorari denied, 295 U. S. 740, the amount received from the United States through the Secretary of the Interior, representing the taxpayer's equitable portion of an amount which had been accumulated and impounded pending termination of litigation in connection with oil and gas claims which, in good faith, had been developed in the bed of the Red River, was held to be income. Under somewhat similar facts the same conclusion was reached in *Obispo Oil Co.* v. *Welch,* 85 Fed. (2d) 860, the case, however, being reversed by the Supreme Court (301 U. S. 190) upon other grounds. In *Marine Transport Co.* v. *Commissioner,* 77 Fed. (2d) 177, affirming *Marine Transport Co.,* 28 B. T. A. 566, it was held that an award made to the petitioner by the Mixed Claims Commission on account of the destruction of a schooner in 1917 was not, as contended by it, a gratuity or bounty but compensation for property destroyed. Payment of the sum of $23,000 by the State of Maryland to a ferry company was held, in *Helvering* v. *Claiborne-Annapolis Ferry Co.,* 93 Fed. (2d) 875, to be compensation for operation of the ferry and hence includable in gross income. A shipping company, which had received a very favorable contract for the carrying of the mails and which had agreed to impound a portion of its earnings to be expended for additional vessels, was required to include in income the amounts impounded during the taxable years, notwithstanding its contention that they were either parts of a Government subsidy useable only for capital purposes or not income within the definition in *Eisner* v. *Macomber,* 252 U. S. 189. *Lykes Bros. Steamship Co.,* 42 B. T. A. 1935; affd., 126 Fed. (2d) 725. *Edwards* v. *Cuba Railroad Co.,* was cited and relied upon in each of the cited cases but found to be inapplicable.

In the preceding paragraphs reference has been made to practically all of the cases in which *Edwards* v. *Cuba Railroad Co.* has been cited or discussed. They indicate that the doctrine has been sparingly applied. It has been pointed out above that the payments in issue were made for cooperating in the soil conservation program. They were denominated "benefit payments." They were made under the

same law and regulations that payments were made for refraining from raising cotton or sugar beets, for devoting a portion of the acreage to the raising of leguminous crops, taking steps to eradicate rodents and noxious weeds, furrowing on the contour, withholding land from grazing, or following out other approved practices for building up the soil and preventing erosion. It is true that the Government had not bound the landowners, by contract, to perform any of the practices; but it, by its regulations and adoption of the program, held out to them the incentive that payment would be made if the practices were followed out. In other words, the Government was in somewhat the same situation that a private individual would be under an outstanding offer of purchase or sale at a given price. It told the landowners what was desired and agreed to pay those who complied with the established practices. Petitioner complied and received the payments. They, in our judgment, were income. Cf. *Salvage* v. *Commissioner*, 76 Fed. (2d) 112.

The bookkeeping entries made by petitioner following receipt of the payments are not determinative, if they have any significance whatever in the instant proceeding. No doubt its capital improvements were enhanced in value; but so would they have been if petitioner had elected, for instance, to expend money in eradicating rodents or noxious weeds, planting leguminous crops, furrowing on the contour, or following most any of the approved practices. We can not believe Congress ever intended that all such payments should be wholly exempted from tax. Nor are we persuaded that a different rule should be applied because, as suggested by petitioner, the United States "admits responsibility for the conditions which necessitate the rehabilitation work." This is no doubt a real justification for the expenditure by the Government; but it does not justify a failure to tax one who is enriched thereby.

At the risk of unnecessarily extending this discussion it may be pointed out that if the payments to petitioner are not taxed as income in the year of receipt it will receive even more favorable treatment than will be received by manufacturers of essential war materials and commodities, who are cooperating with the Federal Government in the present emergency. They, under Title III— Amortization Deduction, Second Revenue Act of 1940 (sec. 124, I. R. Code) and articles 19.124–1 to 19.124–9, Regulations 103, as amended by T. D. 5016, may amortize, over a 60-month period, the cost of facilities constructed by them for the manufacture of essential war commodities; but in determining the adjusted basis of such facilities all amounts received "in connection with * * * [their] agreement to supply articles for national defense, though denominated reimbursements for all or a part of the cost of an emergency facility, are not to be treated as capital receipts but are to be taken

into account in computing income * * * ." (Art. 19.124–6, Regulations 103.) In petitioner's returns of income it included, in its depreciable assets, "Improvements under Federal Aid $6978.52" and deducted as depreciation, a portion thereof based on the estimated life of the property. The claimed deduction has been allowed. It is apparent, therefore, that petitioner will recover, through amortization, depreciation and obsolescence, its total capital investment in the property. If the amounts received from the Government are not included in income, it, in effect, will have a double deduction. In the absence of specific legislation, it should not be assumed Congress intended that recipients of benefit payments be singled out for such preferential treatment.

The Commissioner, in our judgment, committed no error in including the amounts in issue in petitioner's income. Since this is the only adjustment contested,

*Decision will be entered for the respondent.*

Reviewed by the Board.