JAMES BAILEY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21107-85.          Filed May 18, 1987.

*Philip H. Rubenstein*, for the petitioner.
*Donna J. Pankowski*, for the respondent.

NIMS, *Judge*: By notice of deficiency dated March 28, 1985, respondent determined deficiencies in petitioner's

income tax for the following taxable years:

| Year | Deficiency |
|------|-----------|
| 1977 | $986.40 |
| 1978 | 32,424.61 |
| 1980 | 970.00 |
| 1981 | 624.00 |

By notice of deficiency dated March 14, 1986, respondent determined a deficiency in petitioner's income tax for the 1979 taxable year in the amount of $28,615.66. Respondent's amended answer alleged an additional deficiency in petitioner's income tax in the amount of $754.60 for the taxable year 1977.

The issues for decision are: (1) Whether the payments made by the Urban Redevelopment Authority of Pittsburgh to rehabilitate the historic facade of petitioner's property are includable in petitioner's gross income under section 61;[1] (2) whether the payments made by the Urban Redevelopment Authority of Pittsburgh are includable in petitioner's basis in the building; (3) whether petitioner may claim a depreciation deduction with respect to the facade improvement; and (4) whether petitioner may claim an investment tax credit with respect to the property in question.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

At the time the petition in this case was filed, petitioner was a resident of Pittsburgh, Pennsylvania.

Petitioner purchased the property at 1247 Liverpool Street, Pittsburgh, Pennsylvania 15233 (sometimes also referred to as the property), from the Urban Redevelopment Authority of Pittsburgh (hereinafter referred to as URA) on June 1, 1978, for $1,320. The property is located in the Manchester area of Pittsburgh, an area subject to an urban renewal project that began in the 1960s.

A "Redevelopment Area Plan—Urban Renewal Plan" (the plan) was adopted in Manchester. The plan was in effect

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

during the years in issue. The plan was originally funded under title I of the Housing Act of 1949, 42 U.S.C. section 1450 et seq. After January 1, 1975, funding for the plan was provided under 42 U.S.C. section 5305(a)(10).

The property is located in a National Register historic district and a city historic district. The property is not listed in the National Register and is not certified by the Secretary of the Interior as being of historic significance to the district.

A facade grant program was conducted by the URA as part of the plan. The program provided facade grants to purchasers of property in Manchester to provide historic rehabilitation for the facades of the purchased property. In exchange for the purchaser's agreement to remodel the interior of the structure, the URA agreed to rehabilitate the facade.

·Under the facade grant program, the purchaser of property from the URA signed a facade rehabilitation agreement granting an easement, or right to enter the property, back to the URA. Before it obtained the easement from the purchaser, the URA secured a contractor to perform the required rehabilitation of the facade. The program was conducted in this manner to ensure that the facade would be rehabilitated in a manner consistent with the historic classification of the district.

The URA did not enter into a facade rehabilitation agreement with a property purchaser before it had chosen a contractor for the work. The URA was the party that received bids for the rehabilitation work performed on the facades in Manchester, and was the party that entered into the contract with the successful bidder. The amount of the facade grant for any particular property was established in advance and known to the URA at the time the facade rehabilitation agreement was secured, but was not made known to the purchaser of the property.

The general objectives of the plan were to: (1) Assist physical, economic, and social development of the community; (2) provide for a stabilized population and plan for the optimal growth of the area; (3) provide land for new housing, needed community facilities, project improvements, and open space; (4) make provision for a substantial number

of housing units, of low and moderate cost, on land to be disposed of for residential purposes; (5) encourage a sense of community identity, safety, and civic pride; (6) preserve, where feasible, properties of historic and architectural value; (7) eliminate incompatible land uses; (8) eliminate structurally substandard buildings; (9) eliminate physical and environmental blight; and (10) eliminate impediments to land disposition and development.

Petitioner participated in the facade grant program. As part of the agreement for purchase of the property, on June 1, 1978, petitioner covenanted to make certain improvements to the property and, upon completion of the rehabilitation of the property, to make no changes in the improvements until October 22, 2010, that would constitute a major change in the improvements or in the utilization of the property without written approval of the URA.

Petitioner also signed an indenture agreement on June 1, 1978, granting the URA a right-to-enter easement in the property for the purpose of performing the facade rehabilitation. In the indenture agreement, petitioner also agreed to maintain, at his own expense, the exterior of the structure in its restored condition; not to make any changes, modifications, or alterations of any type to the restored exterior of the structure without written consent of the URA; and to rehabilitate and maintain the interior of the structure. Under the terms of the agreement, if petitioner fails at any time to maintain the exterior of the building, the URA has the right to enter the property to repair the exterior at petitioner's expense. The covenant granting the URA the right to enter the property to repair the exterior at petitioner's expense runs with the land.

In 1978, the URA allocated a facade grant of $63,121 for petitioner's property. The URA contracted directly for the facade rehabilitation of the property. The contractor began to work on the facade in November 1978, and was paid as the work progressed. The URA made the following payments to the contractor:

| Date | Amount |
|------|--------|
| Dec. 1, 1978 | $13,360 |
| Dec. 8, 1978 | 5,896 |
| Jan. 1, 1979 | 4,800 |
| Apr. 6, 1979 | 6,016 |

| Date | Amount |
|------|--------|
| June 29, 1979 | $2,430 |
| Aug. 3, 1979 | 3,821 |
| Sept. 7, 1979 | 8,182 |
| Nov. 30, 1979 | 13,616 |
| Jan. 29, 1980 | 5,000 |
| Total | 63,121 |

Petitioner was not required to repay any of the $63,121 facade grant.

The URA had established the Home Improvement Loan program to assist participants in the facade program in restoring the interiors of the structures they had purchased. Petitioner received a low interest (3-percent) loan of $46,564 under this program. The finance charge did not begin to accrue until January 30, 1982, and repayment was scheduled to commence on March 15, 1982. The interior rehabilitation began in 1979 and was completed in September 1979. The contractor for the interior restoration was paid with the loan proceeds and received all his payments in 1979.

Petitioner divided the structure at 1247 Liverpool Street into three apartments. Petitioner began residing in one apartment in 1979 and held the other two apartments as rental units in 1979. The first rental unit was rented in September 1979, and the second was rented in October 1979. Two-thirds of the structure at 1247 Liverpool Street was held as rental property in 1979, 1980, and 1981.

The Secretary of the Interior did not certify that the facade rehabilitation of petitioner's property was consistent with the historic character of the property or the district in which the property is located.

The URA originally scheduled the Manchester region as a site clearance project but changed the plan when the Pittsburgh History and Landmark Society and neighborhood groups convinced the URA to preserve some of the structures of Manchester because of their historic character. Moneys for the facade easement program came from a fund originally established for demolition and site improvements and site clearance.

Before he purchased the property from the URA, petitioner submitted financial information and financial state-

ments to qualify for participation in a low interest loan program designed to assist participants in making the required interior improvements. The only requirements for participation in the facade grant program were ownership of the property and compliance with the building code. There was no requirement that the recipient of a facade grant be an underprivileged individual or have a low income.[2] The amount of the facade grant was determined by the work to be performed on the structure and not by the financial needs of the individual recipient.

Participants in the facade grant program were not required to secure low interest loans from the URA; the loan program and the facade grant program were independent of each other. Recipients of facade grants could use funds from any available source to perform the interior work.

Petitioner was a cash basis taxpayer in 1977, 1978, 1979, 1980, and 1981. Petitioner claimed an investment tax credit in 1979 for the renovations made to the structure on the property. The investment tax credit applied against petitioner's income tax in 1979 reduced petitioner's tax liability to zero. By way of amended returns, petitioner carried back to 1976, 1977, and 1978, and carried forward to 1980 on the excess of the claimed credit.

Petitioner claimed depreciation deductions in relation to his rental properties for the tax years 1979, 1980, and 1981.

Petitioner did not include the $63,121 facade grant in his income. However, petitioner included the facade grant in his basis for the property at 1247 Liverpool Street when he computed his depreciation deductions and investment tax credit.

---

[2]Petitioner testified that it was his understanding that only persons in low income brackets could participate in the facade grant program. Apparently petitioner misunderstood the requirements of the program. Michael Scott, assistant general counsel for the URA, testified that petitioner had to be in a low income bracket in order to qualify for the low interest loan he needed to renovate the interior of the structure, but that there was no income requirement for participation in the facade grant program.

Petitioner argues that Mr. Scott's testimony should be discredited because neither Mr. Scott nor respondent has supplied documentary evidence regarding the lack of an income requirement for participation in the facade grant program. Petitioner has the burden of proof on this issue. Rule 142(a). Because petitioner has failed to produce any documentary evidence regarding the existence of an income requirement, the only evidence in the record regarding an income requirement is the testimony given by petitioner and Mr. Scott. We find Mr. Scott's testimony credible and more convincing than petitioner's vague understanding about the requirements for participation in the program.

OPINION

Respondent takes the position that the $63,121 facade grant to rehabilitate petitioner's property was income to petitioner. The parties have agreed that if the facade grant was income to petitioner, it is includable in petitioner's income in the years in which the contractor received payments, i.e., $19,256, $38,865, and $5,000 in 1978, 1979, and 1980, respectively. Respondent concedes that to the extent that petitioner must include the amount of the facade grant in income, his basis in the property should be increased for depreciation purposes. Respondent also maintains that petitioner is not entitled to claim an investment tax credit with respect to the property.

Relying on positions taken by the Internal Revenue Service (IRS) as exemplified by Rev. Rul. 76-395, 1976-2 C.B. 16, petitioner argues that the facade grant payments are excludable from gross income because the project under which the payments were made was a social benefit program for the promotion of general welfare. Alternatively, petitioner argues that since he did not have "complete dominion" over the facade portion of his premises, the facade grant falls outside the concept of gross income as defined in *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955).

On brief, petitioner does not press the position taken on his return that the $63,121 is includable in basis notwithstanding its exclusion from gross income. We therefore deem this position abandoned.

## Includability of the Facade Grant

"Except as otherwise provided * * * , gross income means all income from whatever source derived." Sec. 61(a). Because neither the Internal Revenue Code nor the legislation authorizing the facade grant contains a provision exempting the facade grant from income, respondent argues that the facade grant is includable in petitioner's gross income.

Petitioner argues that because the facade grant program was established to promote the general welfare of the community, the grant he received is tax exempt under the

general welfare doctrine. He notes that the IRS, itself, has stated that "The Internal Revenue Service has consistently held that payments made under legislatively provided social benefit programs for the promotion of general welfare are not includible in an individual's gross income." Rev. Rul. 76-395, 1976-2 C.B. 16, 17.

In each of respondent's revenue rulings in which the general welfare doctrine has been applied, the grant was received under a program requiring the individual recipient to establish need. See, e.g., Rev. Rul. 76-395, 1976-2 C.B. 16 (Home Rehabilitation Housing and Community Act; grants to low income recipients primarily for correction of critical code violations); Rev. Rul. 78-170, 1978-1 C.B. 24 (Ohio payments to reduce energy costs for low income elderly or disabled heads of households); Rev. Rul. 76-144, 1976-1 C.B. 17 (Disaster Relief Act; grants to persons who, as a result of a major disaster, are unable to meet necessary expenses and needs). Grants received under social welfare programs that did not require recipients to establish individual need have not qualified under respondent's rulings for tax exempt status under the general welfare doctrine. See, e.g., Rev. Rul. 76-75, 1976-1 C.B. 14 (sec. 236 of the National Housing Act; interest reduction payments to a mortgagee on behalf of a limited profit corporation formed to acquire and lease apartments in a lower income rental housing project were includable in the corporation's gross income); Rev. Rul. 76-131, 1976-1 C.B. 16 (payments made by the State of Alaska to long-term residents distinguished from general welfare payments because they were based on the recipient's age and residency requirements regardless of financial status, health, educational background, or employment status).

At least one court has validated respondent's general welfare exclusion. See *Graff v. Commissioner*, 673 F.2d 784, 785 (5th Cir. 1982), affg. per curiam 74 T.C. 743 (1980). In *Graff*, the Circuit Court stated (referring to the National Housing Act):

Section 236 payments are substitutes for rentals, permitting the sponsor to operate profitably at lower rates of such returns. Rentals, however, are gross income, where Section 235 payments are not rental substitutes but rather direct general welfare benefits not taxable. [673 F.2d at 785.]

The facade grants in this case were awarded without regard to any need of the recipients. The only requirements for participation in the facade grant program were ownership of the property and compliance with the building code. Accordingly, facade grants awarded under the program are not tax exempt under the general welfare doctrine.

Nevertheless, the facade grant awarded to petitioner is not includable in petitioners' gross income. In *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955), the Supreme Court held that the term "gross income" as used in the Internal Revenue Code, includes all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."

Respondent maintains that petitioner realized an accession to wealth when the URA paid the contractor to renovate the facade on his property. The grant in this case was not income to petitioner, however, because petitioner lacked complete dominion over the new facade.

To receive the facade grant, petitioner was required to grant an easement to the URA permitting the URA or its agents to enter the property, at first to perform the initial rehabilitation work on the facade, and at any time in the future, to repair the facade at petitioner's expense should petitioner fail to maintain it in accordance with the terms of the indenture agreement. Petitioner was also required to maintain the interior of the structure on his property and was restricted from altering the exterior without written consent of the URA.

Petitioner had no control over the rehabilitation work performed on the facade of his property. No payments for the rehabilitation of the facade were made directly to petitioner. The URA was the party that selected the contractor, negotiated the terms of the contract, and paid for the work that was performed on the facade. The amount of the facade grant was not even made known to petitioner at the time he signed the facade rehabilitation agreement. Therefore, the facade grant is not includable in petitioner's gross income.

Unquestionably, in many contexts, courts have held that payments made by the Government to reimburse a taxpayer for expenditures to construct or purchase property or to

make repairs were income to the recipient. See *Baboquivari Cattle Co. v. Commissioner*, 135 F.2d 114 (9th Cir. 1943), affg. 47 B.T.A. 129 (1942); *Lykes Bros. S.S. Co. v. Commissioner*, 126 F.2d 725 (5th Cir. 1942), affg. 42 B.T.A. 1395 (1940); *Dubay v. Commissioner*, T.C. Memo. 1979-418; *Harding v. Commissioner*, T.C. Memo. 1970-179; *Driscoll v. Commissioner*, a Memorandum Opinion of this Court dated Jan. 27, 1944, affd. in part and revd. in part on unrelated issues 147 F.2d 493 (5th Cir. 1945). However, in each of these cases, unlike the instant case, the taxpayer received funds over which he had complete dominion and control. In *Baboquivari Cattle Co. v. Commissioner, supra*, and *Lykes Bros. S.S. Co. v. Commissioner, supra*, the taxpayer's unfettered use of the funds received was an important factor in determining that they were includable in income.

Respondent's reliance on *Helvering v. Bruun*, 309 U.S. 461 (1940), is misplaced. In *Helvering v. Bruun*, the Supreme Court held that the fortuitous gain accruing to a lessor by reason of the forfeiture of a lessee's improvements on the rental property was a taxable windfall in the year of forfeiture. We note that the value of lessee's improvement on the property was not includable in the lessor's income until the year of forfeiture, when the lessor gained complete dominion over the property. In this case, petitioner lacked complete dominion over the rehabilitation, maintenance, and alteration of the facade. To the extent that he has benefited from the facade grant, petitioner will have to include, in income, any gain that he receives from the increased value of his property attributable to the new facade when he sells or otherwise disposes of the property.

The regulations provide that "In general, the basis of property is the cost thereof. The cost is the amount paid for such property in cash or other property." Sec. 1.1012-1, Income Tax Regs. Respondent concedes that if petitioner is required to include the facade grant in gross income, the amount of the facade grant should be included in petitioner's basis in the property.

We have concluded, however, that the amount of the facade grant is not includable in petitioner's gross income. By receiving the facade grant free of tax liability, petitioner has incurred no cost attributable to the improvements made

to the facade on his property. Accordingly, the amount of the facade grant is not includable in petitioner's basis in the property.

Because petitioner may not include the amount of the facade grant in his basis in the property, petitioner will recognize a greater gain when he sells or disposes of the property. Sec. 1001; sec. 1001-1(a), Income Tax Regs. At that time, he can use the proceeds to pay the tax on the benefit he received as a result of the facade grant.

Petitioner included the $63,121 facade grant in basis for purposes of computing his depreciation deductions. Because the $63,121 grant is not includable in petitioner's basis, his calculation of depreciation deductions was incorrect. Sec. 167(g).

### The Investment Tax Credit

On his 1979 Federal income tax return, petitioner claimed an investment tax credit for the improvements to the property at 1247 Liverpool Street. Section 38[3] allows a credit against income tax for qualified investments in certain property. The investment credit allowed under section 38 is limited to "section 38 property." Sec. 1.48-1(a), Income Tax Regs. Section 48(a)(1)[4] generally defines the

---

[3]Sec. 38 as in effect in 1979 provided in part:

SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

  (a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

[4]Sec. 48(a)(1), as in effect in 1979, provided:

SEC. 48. DEFINITIONS; SPECIAL RULES.

  (a) SECTION 38 PROPERTY.—

    (1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

      (A) tangible personal property (other than an air conditioning or heating unit), or

      (B) other tangible property (not including a building and its structural components) but only if such property—

        (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

        (ii) constitutes a research facility used in connection with any of the activities referred to in clause (i), or

        (iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), or

      (C) elevators and escalators, but only if—

        (i) the construction, reconstruction, or erection of the elevator or escalator is completed by the taxpayer after June 30, 1963, or

types of property that qualify as section 38 property. With certain exceptions not relevant in this case, property used predominantly to furnish lodging shall not be treated as section 38 property. Sec. 48(a)(3).[5] Under section 48(a)(3), petitioner is not entitled to the investment tax credit because his property is used exclusively to furnish lodging for himself and his tenants. See secs. 1.48-1(e), 1.48-1(h), Income Tax Regs. (buildings such as apartment houses do not qualify as section 38 property).

In 1978, Congress added section 48(a)(1)(E) to allow an investment tax credit in the case of a qualified rehabilitated building for that part of the basis attributable to qualified rehabilitation expenditures. Sec. 315(a), Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2828. This credit is not available for buildings, such as apartments, that are used for residential purposes. H. Rept. 95-1445, at 86-87 (1978), 1978-3 C.B. 260-261. Petitioner is not entitled to an investment tax credit under section 48(a)(1)(E) because his property was used for residential purposes.

In 1981, Congress amended section 48(a)(3) to permit an investment credit for rehabilitation expenditures to certified historic structures used for lodging. Sec. 212(c), Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 239. Sec. 48(a)(3) now provides in pertinent part:

(3) PROPERTY USED FOR LODGING.—Property which is used predominantly to furnish lodging or in connection with the furnishing of lodging

---

(ii) the elevator or escalator is acquired after June 30, 1963, and the original use of such elevator or escalator commences with the taxpayer and commences after such date, or

(D) single purpose agricultural or horticultural structures, or

(E) in the case of a qualified rehabilitated building, that portion of the basis which is attributable to qualified rehabilitation expenditures (within the meaning of subsection (g).

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

[5]Sec. 48(a)(3), as in effect in 1979, provided:

(3) PROPERTY USED FOR LODGING.—Property which is used predominantly to furnish lodging or in connection with the furnishing of lodging shall not be treated as section 38 property. The preceding sentence shall not apply to—

(A) nonlodging commercial facilities which are available to persons not using the lodging facilities on the same basis as they are available to persons using the lodging facilities,

(B) property used by a hotel or motel in connection with the trade or business of furnishing lodging where the predominant portion of the accommodations is used by transients, and

(C) coin-operated vending machines and coin-operated washing machines and dryers.

shall not be treated as section 38 property. The preceding sentence shall not apply to—

\* \* \* \* \* \* \*

(D) a certified historic structure to the extent of that portion of the basis which is attributable to qualified rehabilitation expenditures.

Petitioner cannot take advantage of the new amendment. Under section 48(a)(3), the investment tax credit can only be taken with respect to qualified rehabilitation expenditures. Under the 1981 amendments, the term "qualified rehabilitation expenditure" means any amount properly chargeable to a capital account that is incurred after December 31, 1981. Sec. 48(g)(2)(A).[6] Petitioner incurred the expenses for which he claimed an investment tax credit in 1979. Accordingly, the amount that petitioner incurred was not a qualified rehabilitation expenditure.

Nor does petitioner's property qualify as a certified historic structure. Under the 1981 amendments, section 48(g)(3)[7] provides in part:

(3) CERTIFIED HISTORIC STRUCTURE DEFINED.—
    (A) IN GENERAL.—The term "certified historic structure" means any building (and its structural components) which—
        (i) is listed in the National Register, or
        (ii) is located in a registered historic district and is certified by the Secretary of the Interior to the Secretary as being of historic significance to the district.

Petitioner's property is not listed in the National Register nor is it certified by the Secretary of the Interior as being of historic significance to the district.

For the foregoing reasons, petitioner may not claim an investment tax credit with regard to the property at 1247 Liverpool Street.

*Decision will be entered under Rule 155.*

---

[6]Sec. 48(g) was amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085. The 1986 amendments changed the definitions of "qualified rehabilitation expenditure" and "certified historic structure." The new definitions generally apply to property placed in service after Dec. 31, 1986, and therefore do not apply in this case. Sec. 251(d), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2186.

[7]See note 6 *supra.*