UNION PACIFIC CORPORATION AND AFFILIATED COMPANIES,. PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24152-81.    Filed July 18, 1988.

*James P. Holden, Susan H. Serling,* and *J. Walker Johnson,* for the petitioner.
*Lewis R. Carluzzo,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| Year | Deficiency |
| --- | --- |
| 1975 | $4,072,046 |
| 1976 | 5,509,231 |
| 1977 | 45,869,744 |

After concessions by the parties, the issues for decision are whether petitioner is entitled to an investment tax credit for the costs of operating equipment used to detect flaws in railroad track, and whether petitioner is entitled to an investment tax credit for investments in mobile homes used to house certain employees.

The facts were fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioner Union Pacific Corp. is a corporation organized under the laws of the State of Utah. It had its principal office in New York, New York, at the time it filed its petition.

For both book accounting and tax purposes, petitioner used the accrual method of accounting. It maintained its books of account and filed its Federal income tax returns on a calendar year basis. For calendar years 1975 through 1977, petitioner timely filed consolidated Federal income tax returns with the Internal Revenue Service Center, Holtsville, New York, which included the income, expenses, etc., of its affiliate Union Pacific Railroad Co. (Union Pacific).

During 1975 through 1977, Union Pacific was a common carrier railroad operating in interstate commerce. During those years, Union Pacific used the retirement-replacement-betterment (RRB) method of accounting for depreciation of its railroad track structure.[1]

One of the principal components of railroad track structure is rail. Rail is the portion of the railroad track structure that carries the wheels of railroad rolling stock. When steel is rolled into rail, certain rails may be produced with metallurgical defects and flaws. Other defects and flaws may be created as installed rail is subjected to pressure and wear. These defects and flaws increase the possibility that a rail will break or otherwise fail, which could result in an accident such as a derailment.

When defective rail is identified, it must be removed and replaced. To permit early detection of incipient rail failure, Union Pacific operates rail-test cars over its lines of railroad. Rail-test cars are specially equipped railroad cars that run over the track at speeds up to 15 miles per hour. The cars carry electronic test equipment that sends through

---

[1]Under the RRB method of accounting for depreciation, the original costs of new track are capitalized. As the track is replaced, the costs of the replacement track and its installation, less the salvage value of the track removed, are expensed, unless the track is bettered, in which event the part of the cost allocable to the betterment is capitalized and the balance of the cost is expensed. If an asset is retired without replacement, the original capital account is reduced. See generally Rev. Rul. 67-22 (1967), 1967-1 C.B. 52, 52-53. The RRB method of accounting for depreciation was repealed in 1981. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 203(c)(1), 95 Stat. 172, 221.

the rail ultrasonic signals which are designed to identify defects. An operator in the rail-test car monitors the equipment and evaluates the signals. By this process, the operator is able to detect defects and flaws in the rail.

When a rail-test car operator identifies a rail that may be defective, the rail-test car stops. An operator then performs an additional test on the rail using hand-held equipment. If the operator verifies that the rail is defective, the operator marks the rail by painting it, and records the number and location of the rail. A rail work crew follows each rail-test car and removes and replaces all rail identified as defective. The rail-test car itself is neither designed nor equipped for the physical installation of rail.

Rail-test cars operate in accordance with itineraries of regularly scheduled tests. Rail is tested from one to four times per year, depending on the tonnage moved over the track and the track's age. Union Pacific's sole purpose for operating the cars is to permit it to identify defective rail as soon as possible so that the rail may be removed and replaced.

During the years in issue, Union Pacific made replacements of rail pursuant to the detection by rail-test cars of specific track material needing removal and replacement. Petitioner claimed investment tax credits with respect to its investment in replacement track material placed in service during those years. It included the costs incurred to operate rail-test cars in investment in replacement track material.

During 1975 through 1977, Union Pacific employed certain employees, whom we will refer to as section employees, whose responsibilities included inspecting, maintaining, and repairing designated sections of Union Pacific's lines of railroad. Some of the section employees were responsible for sections of Union Pacific's lines that were located in remote areas, distant from available housing. Union Pacific made available to these employees housing owned by Union Pacific. We will refer to such housing as section housing. Mobile homes were often used as section housing.

Section employees who lived in section housing were paid the same compensation, and received the same benefits, as section employees who did not live in section housing. Section employees who lived in section housing were not

charged rent or other compensation by Union Pacific for the use of either the housing or the Union Pacific-provided furnishings therein.[2]

Section 38[3] allows an investment tax credit as determined under sections 46 to 50. The credit is allowed for qualified investment in section 38 property. See sec. 46. Section 38 property generally includes all depreciable tangible personal property. Sec. 48(a)(1).

The first issue for decision is whether costs incurred to operate rail-test cars are includable in petitioner's qualified investment in section 38 property. Under section 48(a)(9), if a railroad uses the RRB method of accounting for depreciation of its track structure, replacement track material is included in section 38 property if the replacement is made because, among other reasons, a rail-test car detects specific track material that needs to be replaced. Sec. 48(a)(9)(C). Section 48(a)(9) defines the term "track material" as ties, rail, other track material, and ballast.[4] The legislative history states that, in addition to the items enumerated in the statute, "related installation costs" are to be included in qualified investment in section 38 property. S. Rept. 92-437, at 34 (1972), reprinted in 1972-1 C.B. 559, 577. The legislative history further provides that "The costs of removing old track material are not to qualify for the credit." S. Rept. 92-437, *supra.* The parties agree that if we determine that the costs in issue are described in section

---

[2]Some section housing was equipped with electric meters, in which case the section employee was required to pay for electricity used, Other units were not equipped with electric meters. During the years in issue, that housing was furnished with electricity by Union Pacific. Section employees were not charged for other utilities, such as water and bottled propane gas.

[3]All section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[4]Sec. 48(a)(9) provides, in pertinent part:

(9) RAILROAD TRACK.—In the case of a railroad * * * which uses the retirement-replacement method of accounting for depreciation of its railroad track, the term "section 38 property" includes replacement track material, if * * *

\*      \*      \*      \*      \*      \*      \*

(C) the replacement is made pursuant to the detection by a rail-test car of specific track material needing replacement * * *

* * * For purposes of this paragraph, the term "track material" includes ties, rail, other track material, and ballast.

The section was repealed as part of a legislative overhaul of the use of the RRB method of depreciation by, and the availability of the investment credit to, railroads. See Pub. L. 97-34, sec. 211(a)(2), 95 Stat. 227.

48(a)(9), all other requirements to qualify as section 38 property have been met.

Petitioner first argues that because the costs of operating the rail-test cars are related to the cost of replacement track material they are a cost of replacement track material so as to be includable in qualified investment in section 38 property. We disagree. Congress indicated that costs relating to the installation of replacement track material are to be included in qualified investment in section 38 property. But Congress also indicated that costs of removing old track are not to be included in qualified investment in section 38 property. Both removal and installation costs are logically "related to" the replacement track material, yet Congress distinguished between them. Thus, merely because a cost is related to track replacement does not necessarily mean it is a cost of the replacement track material includable in qualified investment in section 38 property. Similarly, it does not follow, as petitioner argues, that because "detection by a rail-test car of specific track material needing replacement" is one condition for eligibility of the the costs of replacement track material for the investment credit (see note 4 *supra*), that the costs of operating rail-test cars are replacement costs and therefore encompassed within the phrase "replacement track material."

Petitioner contends that, even if the costs of operating the rail-test cars are not per se encompassed within the phrase "replacement track material" in section 48(a)(9), they should be held to be within the meaning of the phrase "related installation costs," which costs Congress has clearly indicated should be included in the amount of the investment by a railroad in replacement track material eligible for the investment credit. See pages 35-36 *supra*. Respondent contends that such costs are a cost of removing the old track and are therefore not includable in qualified investment in section 38 property, citing the express legislative intention to that effect. See page 35 *supra*.

Petitioner argues that, when classifying expenditures, we should look to the origin of the expenditure and that the sole purpose for operating the rail-test cars, and hence the origin of the operating expenses, is the installation of new

track. While it is undoubtedly true that the purpose of operating the rail-test cars is the installation of new track, the argument proves too much. The purpose of removing the old track is also the installation of new track, but Congress' intent was not to allow track removal costs as qualified investment in section 38 property. Merely because the purpose for, and hence the origin of, the expenditure is installation of the new track does not make the expenditure includable in qualified investment in section 38 property.

Finally, petitioner argues that we may hold for respondent only if we find the rail-test car operating costs are costs of removing the defective track. We disagree. Nothing in either the statute or the legislative history indicates that costs must be allocated exclusively to either removal or installation. The costs of operating the rail-test cars may best be described as neither a cost of removing defective track nor of installing new track, but rather as a general maintenance cost—a cost of detecting the defective track, see pages 35-36 *supra*. Removing the old track, and the costs associated therewith, is one step removed from installing the new, with its associated costs. Finding the defective track, and the costs thereof, is similarly a step still further removed from installing the new track. As we view the matter, it would be incongruous to hold that the costs associated with an action preceding an action the costs of which have been expressly removed from eligibility for the investment credit should be eligible for such credit. Moreover, we are constrained to note that it would be equally incongruous to hold that the costs of operating the rail-test cars should be included in the phrase "related installation costs" in the event that there were no replacements of defective track during a taxable year—an eventuality admittedly of unlikely but nevertheless possible occurrence. We therefore hold that such costs are not "related installation costs" and are not includable in qualified investment in section 38 property.

We turn now to the second issue—whether the mobile homes used as section housing are section 38 property. Section 48(a)(3) provides, with exceptions not relevant here, that "Property which is used predominantly to furnish lodging or in connection with the furnishing of lodging shall

not be treated as section 38 property." The parties agree that, unless this lodging exception applies, the mobile homes qualify as section 38 property.

Petitioner argues that the only lodging that is not section 38 property under the exception is that for which rent is charged. Respondent argues that the plain meaning of the term "lodging" is any place where a person lives. We agree with respondent.

The term "lodging" is not defined in the statute. Cases dealing with the lodging exception have involved either rental property (see, e.g., *Bailey v. Commissioner*, 88 T.C. 1293 (1987); *Moore v. Commissioner*, 58 T.C. 1045 (1972), affd. per curiam 489 F.2d 285 (5th Cir. 1973)) or property used by an individual taxpayer (see *Abbott v. Commissioner*, T.C. Memo. 1981-424) and are of little help in determining whether petitioner's contention that the mobile homes at issue here do not fall within the lodging exception is correct.

The dictionary definitions of "lodging," upon which respondent relies, include "sleeping accommodations," "a temporary place to stay" and "a room in the house of another used as a place of residence." Webster's New Collegiate Dictionary 676 (1977). See also Webster's Third New International Dictionary 1329 (1981); Webster's Ninth New Collegiate Dictionary 702 (1985).[5] While each of these is consistent with the collection of rent, none of them requires it. Petitioner bases its argument that we should not apply the plain meaning of the term on the legislative history of the lodging exception, the regulations interpreting it, and respondent's practice of including in qualified investment in section 38 the entire cost of assets, a part of which is the cost of employee housing.[6]

---

[5]Petitioner cites to the definition "rented rooms" in American Heritage Dictionary of the English Language ″67 (1969). That definition also includes as an indicated preferred definition "sleeping accommodations." Petitioner also cites to the definition "a room or rooms rented" in Webster's New World Dictionary 831 (2d College ed. 1986). That definition is one of two alternative definitions; the other is "a place to live in." Similarly, the definition "accomodation in hired rooms" in 6 The Oxford English Dictionary 395 (1961) is an alternative to, among others, "dwelling" and "abode."

[6]Petitioner also argues that the only residential property used in a trade or business or for the production of income is that for which rent is charged, and that, therefore, the term "lodging" must include only rental properties. This argument assumes that lodging used in a trade or business or for the production of income is used in the trade or business of furnishing lodging or for the production of income from lodging, an assumption that we do not think is valid. Certainly, the word "lodging" in sec. 119 (which, under certain conditions, excludes the

We do not find anything in the legislative history that would require us to give the term "lodging" something other than its plain meaning.[7] The rationale for the lodging exception was stated in the Joint Committee on Taxation's General Explanation of the Revenue Act of 1961: "Lodging, or residential real estate, * * * [is] excluded on the grounds that this property for the most part is used by consumers rather than in production." Staff of Joint Comm. on Taxation, 87th Cong., 1st Sess., General Explanation of Committee Discussion Draft of Revenue Bill of 1961, at 9 (J. Comm. Print 1961).[8] Petitioner argues that its section housing is used for production, not by consumers, and that therefore the investment tax credit should be allowed. While the assets in question here are provided by Union Pacific in order to further its own productive purposes, they are nonetheless used by individuals to replace assets that clearly would not be section 38 property—if section housing were not provided to the section employees, those employees would be forced to either rent or buy other housing.[9]

Second, we do not agree that respondent's regulations require rent to be paid for the use of the property for it to fall within the lodging exception. The regulations provide that—

the term "section 38 property" does not include property which is used predominantly to furnish housing or is used predominantly in connection with the furnishing of lodging during the taxable year. Property used in the living quarters of a lodging facility * * * shall be considered as used predominantly to furnish lodging. The term "lodging facility" includes an apartment house, hotel, motel, dormitory, or any other facility * * * where sleeping accommodations are provided and let * * * [Sec. 1.48-1(h)(1)(i), Income Tax Regs.]

value of lodging furnished to an employee) and the regulations thereunder is not accorded such a restricted interpretation.

[7]The lodging exception was part of the investment tax credit enacted in 1962. Revenue Act of 1962, sec. 2(b), Pub. L. 87-834, 76 Stat. 960, 963-970. The legislative history of the Revenue Act of 1962 does not shed light on the meaning of the term "lodging." See H. Rept. 1447, 87th Cong., 2d Sess. 12 (1962), 1962-3 C.B. 405, 416; S. Rept. 1881, 87 Cong., 2d Sess. 16 (1962), 1962-3 C.B. 703, 722.

[8]That draft contained language identical to that which was eventually enacted in the Revenue Act of 1962. See Revenue Act of 1961, sec. 2(b), Discussion Draft 12 (Comm. Print 1961).

[9]Rental housing would, of course, fall within the lodging exception, and housing owned and occupied by the employee is not depreciable property, and therefore not sec. 38 property. Sec. 48(a).

Petitioner argues that use of the word "let," in conjunction with "provided" indicates that payment of rent is required for a facility to be considered a lodging facility. Even if rent is required for property to be a lodging facility, it does not follow that rent must be paid for property to be used to furnish lodging within the meaning of the statute. The term "lodging facility" is defined only because property that is used in the living quarters of such a facility is, under the regulations, used predominantly in the furnishing of lodging. The regulations do not indicate that lodging may only be furnished in a lodging facility as defined there, and we decline to so hold.

Finally, the instances in which respondent has allowed investment tax credits for assets used for housing when they are directly attached to assets used in production are distinguishable. Each involved oil drilling rigs, where the entire asset, the rig, was not used "predominantly to furnish lodging" as required by the lodging exception in section 48(a)(3). See Rev. Rul. 73-145 (1973), 1973-1 C.B. 35. See also, e.g., Private Letter Ruling 8309023 (Nov. 24, 1982). Petitioner does not argue that the mobile homes in question were somehow part of a larger asset so that, if they were used to furnish lodging, they were not used predominantly to furnish lodging. Moreover, we think it significant that the oil drilling rigs are covered by a specific section of the investment credit provisions allowing the credit for this type of installation. See sec. 48(a)(2)(B)(x). In the instant situation, we are not dealing with such an inclusionary provision; in point of fact, we are dealing with the opposite type of provision, namely, exclusionary.

In light of the plain meaning of the term "lodging," we hold that an investment tax credit is not allowable for petitioner's investment in mobile homes used as section housing.

To reflect the foregoing, and the concessions of the parties,

*Decision will be entered under Rule 155.*