DAVID J. MAINES AND TAMI L. MAINES, PETITIONERS *v*.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14699–12.              Filed March 11, 2015.

Ps received targeted economic development payments from
the state of New York. New York calls these payments
"credits" and treats them as refunds for "overpayments" of
state tax. All the credits required Ps to make some amount
of business expenditure or investment in targeted areas
within the state. One of the credits, the QEZE Real Property
Tax Credit, is limited to the amount of past real-property tax
actually paid. The other two credits, the EZ Investment
Credit and the EZ Wage Credit, are not limited to past tax
actually paid. All the credits first reduce a taxpayer's state
income-tax liability; any excess credits may be carried forward
to future years or partially refunded. *Held*: The state-law
label of the credits as "overpayments" of past tax is not
controlling for Federal tax purposes. Because the EZ Invest-
ment Credit and the EZ Wage Credit do not depend on past
tax payments, they are not refunds of past "overpayments"
but rather are like direct subsidies. Because it does depend on
past property-tax payments, the QEZE Real Property Tax
Credit is treated like a refund of past overpayments. *Held*,
*further*, the portions of the EZ Investment Credits and the EZ
Wage Credits that only reduce Ps' state-tax liabilities are not
taxable accessions to wealth. However, any excess portions of
the credits that are refundable are taxable accessions to
wealth to Ps. *Held*, *further*, the portions of the QEZE Real
Property Tax Credit payments that only reduce Ps' state-tax
liabilities are not taxable accessions to wealth. Refundable
portions of the QEZE Real Property Tax Credit payments are
includible in Ps' gross income under the tax-benefit rule to the
extent that Ps actually benefited from previous deductions for
property-tax payments.

*Ryan M. Mead*, for petitioners.

*John M. Janusz*, *Kevin Michael Murphy*, *Justin G. Meeks*, and *Anne D. Melzer*, for respondent.

OPINION

HOLMES, *Judge*: New York State uses extremely targeted tax credits as an incentive for extremely targeted economic development in extremely targeted locations. Those who receive these credits may be extremely benefited—even if they do not owe any state income tax, New York calls the credits overpayments of income tax and makes them refundable. David and Tami Maines say that none of the credits should be taxable because New York labels them "overpayments" of past state income tax, and they never claimed prior deductions for state income tax. The Commissioner disagrees and argues that these refundable credits are, in substance even if not in name, cash subsidies to private enterprise—and just another form of taxable income. [1]

## *Background*

The New York Economic Development Zones Act offers state-tax incentives to attract new businesses and to encourage expansion of existing ones. N.Y. Gen. Mun. Law secs. 955–969 (McKinney 2012). [2] In 2000 the program changed its name to the Empire Zones Program (EZ Program). The EZ Program provides incentives to stimulate private investment and business development, and tries to create jobs in impoverished areas in New York State. Businesses in Empire

---

[1] The New York Constitution prohibits direct gifts to corporations or individuals from state funds. N.Y. Const. art. VII, sec. 8 (McKinney 2006). Such clauses, found in many state constitutions, present perhaps intentional difficulties for the sort of targeted economic development at issue in this case. *See* Peter J. Galie & Christopher Bopst, "Anything Goes: A History of New York's Gift and Loan Clauses", 75 Alb. L. Rev. 2005, 2005–2006 (2012) (gift and loan restrictions strictly limit state and local government taxing and spending powers); Martin E. Gold, "Economic Development Projects: A Perspective", 19 Urb. Law. 193, 210 (1987) (constitutional prohibitions major limitation on economic development). We decide in this case only the possible federal-tax recharacterization of the refundable credits at issue here, and not any possible state-law recharacterizations.

[2] Section references that do not cite New York law are to the Internal Revenue Code in effect for the years in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.

Zones have to apply to become certified EZ businesses. Certified EZ businesses qualify for certain EZ tax credits. A certified EZ business that meets specific employment tests may become a Qualified Empire Zone Enterprise (QEZE). N.Y. Tax Law sec. 14(a) (McKinney 2014). QEZEs are eligible for additional targeted tax credits. The various EZ credits require that the business stay put within a designated area and meet certain annual employment requirements. *See, e.g.*, *id.* secs. 15(a) and (b), 16.

The three credits at issue in this case are the QEZE Credit for Real Property Taxes, *id.* secs. 15, 606(bb), the EZ Investment Credit, *id.* sec. 606(j), and the EZ Wage Credit, *id.* sec. 606(k). Eligibility for all the credits depends on a business' meeting the requirements. EZ businesses that are corporate-level taxpayers, get credits against their franchise-tax liability; EZ businesses that are passthrough entities, such as partnerships, S corporations, or LLCs taxed as partnerships, get credits against the personal income-tax liabilities of their partners or members. The taxpayers in this case, the Maineses, own two firms, Endicott Interconnect Technologies, Inc., and Huron Real Estate Associates. Endicott is an S corporation, and Huron is an LLC taxed as a partnership.[3] Therefore any reference to "taxpayer" refers to individuals such as the Maineses and not to corporate taxpayers; any reference to "shareholders" refers to shareholders in S corporations.

Because eligibility for the credits depends on a business' meeting specific requirements, the full credit amount is calculated at the entity level even for pass-through entities. A partnership, for example, would report the credit amount on its NY Form IT–204, Partnership Return. It would then

---

[3] Taxation of S corporations is under subchapter S of the Code, and taxation of partnerships is under subchapter K. S corporations and partnerships are similar in that they do not pay taxes themselves but rather pass through items of income and deduction to their shareholders or partners. Secs. 701, 1366(a)(1). As an LLC (which stands for limited liability company) with two or more members, Huron had a choice of how it would be taxed—the Code treats such an LLC as a partnership unless the LLC elects otherwise. Sec. 301.7701–3(b)(1)(i), Proced. & Admin. Regs. Huron did not elect otherwise. Even though they don't pay taxes, however, both S corporations and partnerships do file information returns to report their income and deductions to their owners. *See* secs. 701, 6031, 6037.

report to individual partners (or, in the case of LLCs, members; or, in the case of S corporations, shareholders) their distributive share of the "pass-through credits" on Form IT–204–IP, New York Partner's Schedule K–1. An individual claims his share of these credits on credit-specific forms, such as Form IT–601, Claim for EZ Wage Tax Credit, or Form IT–606, Claim for QEZE Credit for Real Property Taxes. He then reports these amounts on his personal income-tax return, New York Form IT–201, Resident Income Tax Return, which results in credit amounts that reduce his individual income-tax liability and any refundable portion being paid by the state to him individually. The process is similar for other passthrough entities, such as S corporations.

The first tax credit at issue here is the QEZE Real Property Tax Credit. N.Y. Tax Law sec. 606(bb). The formula for computing this credit starts with the amount of real-property taxes a QEZE paid, and depends on when the business first became a QEZE. *Id.* sec. 15(b)(1) and (2). The QEZE calculates the total credit amount based on the property taxes previously paid, and when the QEZE is a passthrough entity, it provides its partners or shareholders with a distributive share of the credit. *Id.* It was the taxes paid and the business activity of Huron and Endicott that caused New York to pay the credits, but New York does not distinguish between forms of business when passing out QEZE credits: Partners in a QEZE partnership or shareholders of a QEZE New York S corporation receive distributive shares of the credit and claim that amount on their individual returns. The amount, however, cannot exceed the real-property taxes paid, which in this case means the amount of real-property taxes that Huron or Endicott paid. *See id.* subsecs. (e) and (f–1). [4] It is

---

[4] The amount of credit and tax benefit that passes through to the Maineses is a consequence of the property tax Huron pays. Huron's property taxes must be taken into account at the partnership level for its taxable year, and therefore its claimed property-tax expenses and the Maineses' share of those expenses are partnership items. *See* sec. 6231(a)(3); sec. 301.6231(a)(3)–1, Proced. & Admin. Regs. These credits—because they pass through to the Maineses—affect the Maineses' federal tax bill. That makes them "affected items." *See* sec. 6231(a)(5). The Commissioner may issue an affected-items notice of deficiency without opening and closing a partnership-level proceeding as long as the Commissioner is bound by the partnership items as reflected on the partnership's return. *See, e.g.*, *Meruelo v. Commissioner*, 691 F.3d 1108, 1109, 1117 (9th Cir.

important to note that while the amount of the credit is based upon the amount of *real-property tax* paid, the credit is against the New York *income-tax* liability (or corporate-franchise tax liability) of the taxpayer who claims the credit. *Id.* subsec. (a). Any amount of an individual's distributive share of the credit not used in a particular tax year to reduce an income-tax liability is treated as an overpayment of New York income tax. *Id.* sec. 606(bb)(2). New York State does not tax the refunded portion of the credit, but treats it as a refund of state income tax. *Id.* So to summarize, as a QEZE, Huron qualified for the credit based on the amount of property tax it paid, but it was the Maineses who claimed their distributive share of the property-tax credit on their individual returns and who used it to reduce their own income-tax liability and receive a refund.

The second credit at issue is the EZ Investment Credit. This credit is eight percent of the cost or other basis for federal income-tax purposes of tangible property in an Empire Zone and acquired or built while the area is designated as an Empire Zone. N.Y. Tax Law sec. 606(j)(1). To be eligible, the property must meet several requirements. It must be "purchased" as defined in section 179(d), located in a New York State Empire Zone, depreciable under the Code with a useful life of four or more years, and fit into one of only five listed categories. N.Y. Tax Law sec. 606(j)(2) and (3). The credit is against income tax or the corporate franchise tax, and the taxpayer claiming the credit—in this case an individual partner or shareholder in an S corporation—may carry forward any unused portion of the credit or may receive fifty percent of the excess as a refund if the taxpayer qualified as an owner of a new business under N.Y. Tax Law sec. 606(a)(10). *See id.* subsec. (j)(4).

The final credit at issue here is the EZ Wage Credit. *Id.* subsec. (k). An EZ business qualifies for the EZ Wage Credit if its jobs, employees, and employment terms meet certain requirements. As with the other two credits, the credit is against a corporate taxpayer's franchise tax or an individual's income tax. A pass-through EZ business reports to its partners or shareholders their distributive share of the EZ

2012), *aff'g* 132 T.C. 355 (2009); *Gustin v. Commissioner*, T.C. Memo. 2002–64.

Wage Credit, and those individuals claim it as a credit against the New York income tax on their personal returns. Any excess credit that remains after reducing an individual's income-tax liability may be carried over or partially refunded. *Id.* subsec. (k)(5).

The Maineses are partners in Huron and shareholders in Endicott, and their businesses responded to the incentives New York gave them. Huron qualified for the QEZE Real Property Tax, the EZ Investment, and the EZ Wage Credits. And Endicott Interconnect's business likewise qualified it for the EZ Investment and the EZ Wage Credits. From 2005 to 2007 Huron deducted local property-tax payments on its federal returns—specifically, on Form 8825, Rental Real Estate Income and Expenses of a Partnership or an S Corporation—reducing the amount of income reported to the Maineses on their Schedules K–1, Partner's Share of Income, Deductions, Credits, etc.

On their New York income-tax returns, Forms IT–201, the Maineses claimed no state withholding or estimated tax payments. But for 2005 they wiped out half their state income-tax liability with nonrefundable state credits not at issue in this case and the other half with part of the refundable EZ credits; for 2006 and 2007, they wiped out their entire state income-tax liability with nonrefundable state credits. Thus for tax years 2005 to 2007, they had actually paid no state income taxes.

But having done just what New York wanted, the Maineses reaped a bountiful harvest of the New York EZ credits for this period. And because they had little to no state income-tax liability in these years for the credits to offset, the refundable credits led to large "refund" payments from New York to the Maineses.

## *Discussion*

The parties disagree about none of these facts, and both have moved for summary judgment. Their dispute is instead about whether these excess refundable state-tax credits are taxable income under federal law. It is a novel and purely legal question.[5]

_____

[5] This case is one of eleven related but unconsolidated cases filed by New York residents arising from disputes about the federal tax treatment of

A. *Tax Benefits, State-Created Legal Interests, and Federal Characterization*

We begin with an introduction to the "tax benefit rule." The need for this rule lies in our system of taxing income on an annual basis. The world doesn't come to an end and then begin again on January 1 every year, so courts early on had to figure out what to do when a transaction looked one way at the end of a tax year but looked different in a later year.

The classic example is a bad-debt deduction. Imagine a taxpayer who writes off the principal of a loan in January 2000 because his debtor can't pay. But then in September his debtor wins the lottery and repays the debt. No bad-debt deduction here, because the debt turned out not to be bad. But what happens if we move the hypothetical forward six months? The taxpayer writes off the loan in July 2000. Nothing changes before the end of the year, so the taxpayer is entitled to claim a bad-debt deduction. *See* sec. 166. But the debtor wins the lottery in February 2001 and repays the debt.

Remember that in this second hypothetical, the taxpayer was getting a deduction for unrepaid principal. The return of principal is generally not includible in taxable income. *See, e.g.*, *Nat'l Bank of Commerce of Seattle v. Commissioner*, 115 F.2d 875, 876 (9th Cir. 1940), *aff'g* 40 B.T.A. 72 (1939). And the taxpayer—from the perspective of the end of his tax year—quite properly took a bad-debt deduction. But before taxes isn't he economically in the same position as the taxpayer in the first hypothetical?

Of course he is. And the tax-benefit rule is how tax law squares the hypotheticals to reach the same result—more or less.[6] It tells us to look at the subsequent event (in these hypotheticals, the unexpected repayment of a loan) and ask: If that event had occurred within the same taxable year, would it "have foreclosed the deduction?" *See Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 383–84 (1983).[7] If yes, the subsequent event is taxable.

---

these credits.

[6] Though maybe not exactly—a taxpayer may find himself in different tax brackets in different years, for example.

[7] The rule is thus one of those odd bits of tax law that began in common-
Continued

Easy enough in the bad-debt case—if the debtor in the second hypothetical had won the lottery in 2000 just like the debtor in the first hypothetical, the taxpayer would have been repaid and not entitled to a bad-debt deduction.

Now let's move on to state-tax refunds. As all federal taxpayers who itemize their deductions learn, a state income-tax refund has to be added to one's federal taxable income in the year it's received if one took a deduction for state income-tax payments for a preceding year. The logic is pretty straightforward. Imagine a taxpayer who pays $1,000 in state income taxes in year 1. His state (acting with unimaginable speed) sends him a $200 refund just before the stroke of midnight on New Year's Eve. His state income-tax deduction is $800. Now imagine another taxpayer who pays $1,000, but who gets his refund only in year 2. Under the tax-benefit rule, he gets the $1,000 deduction on his year 1 tax return, but has to include the $200 refund in his year 2 income. Roughly equal cases get treated roughly equally.

But what if someone who doesn't itemize in year 1 gets a refund in year 2? The answer in that case is that he does *not* have to include his state income-tax refund on his year 2 return, *see Tempel v. Commissioner*, 136 T.C. 341, 351 n.19 (2011) (stating that state-tax refunds are not income unless the taxpayer claimed a deduction for them—for example, by itemizing for the previous year), *aff'd sub nom. Esgar Corp. v. Commissioner*, 744 F.3d 649 (10th Cir. 2014): He got no deduction in year 1 for the state income tax that he paid, so he got no federal tax benefit. And without a federal tax benefit, he doesn't have to bear a federal tax burden on a refund he receives in year 2. *See, e.g., Clark v. Commissioner*, 40 B.T.A. 333, 335 (1939) (holding that so long as "petitioner

---

law fashion in caselaw. In the early days of the income tax, it was unclear if the rule was valid. But then our predecessor, the U.S. Board of Tax Appeals, upheld the application of the rule in 1929, *see Excelsior Printing Co. v. Commissioner*, 16 B.T.A. 886 (1929), and the Fifth Circuit commented soon thereafter that the rule was a principle that "seems to be taken for granted," *Putnam Nat'l Bank v. Commissioner*, 50 F.2d 158, 158 (5th Cir. 1931), *aff'g* 20 B.T.A. 45 (1930). The rule since then has become partially codified, *see* sec. 111, and is now settled as a background principle. For a history of the development of the tax-benefit rule, see generally Boris I. Bittker & Stephen B. Kanner, "The Tax Benefit Rule", 26 UCLA L. Rev. 265 (1978), and Patricia D. White, "An Essay on the Conceptual Foundations of the Tax Benefit Rule", 82 Mich. L. Rev. 486 (1983).

neither could nor did take a deduction in a prior year," any amount he receives the next year "is not then includable in his gross income"); Rev. Rul. 79–315, 1979–2 C.B. 27.

Now we can edge toward the real facts in this case. The Maineses stipulated that they took no deduction on their federal income-tax returns for the years at issue for state income tax paid in the preceding year.[8] They argue that their credits under the EZ Program are just like excess state income-tax withholding—they point out that the credits that New York gave them are defined by state law to be "overpayments" of state income tax.[9] They argue that they are like our nonitemizing hypothetical taxpayer, which means that they got a big state income-tax refund that they don't have to include in their federal taxable income.

We have to agree with the Maineses in part. They are correct that New York calls these payments "credits" and that New York says these "credits" are "overpayments" of state income tax. But in truth the Maineses didn't pay this amount in state income tax. So the key question in this case becomes whether a federal court applying federal law has to go along with New York's definition.

The Maineses understand the importance of this question, and they argue that if New York State tax law calls these payments "overpayments" we have no power to call them something different. They point to cases like *Aquilino v. United States*, 363 U.S. 509, 513 (1960) (quoting *United*

---

[8] After claiming at first that they never deducted New York real-property taxes on their federal income-tax returns, the Maineses admitted that this was incorrect—they never deducted New York real-property taxes personally, but Huron did on its federal return. One might think this would mean the Maineses' receipt of the QEZE Credit for Real Property Taxes would trigger the tax-benefit rule. The Maineses argue, however, that because the New York tax code labels the QEZE Credit for Real Property Taxes credit as a credit against state *income* tax—and any refund of that credit as a refund of state *income* tax—we should instead focus on their federal deduction of state income tax. According to them, because the credit is nominally a refund of state income tax, its receipt can't trigger the tax-benefit rule for them because they never claimed a deduction for payment of New York state income tax on their federal returns.

[9] N.Y. Tax Law sec. 606(j)(4) (McKinney 2014) (labeling the Empire Zone Investment Credit refunds "overpayments"); *id.* subsec. (bb)(2) (labeling the QEZE Credit for Real Property Taxes refunds "overpayments"); *id.* subsec. (k)(5) (labeling the Empire Zone Wage Credit refunds "overpayments").

*States v. Bess*, 357 U.S. 51, 55 (1958)), where the Supreme Court held that Federal tax law "'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'" In *Drye v. United States*, 528 U.S. 49, 58 (1999) (citing *Morgan v. Commissioner*, 309 U.S. 78, 80 (1940)), the Court explained that we look first to state law to "determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." That is, state law creates legal rights and interests; federal law designates how those rights or interests will be taxed. *See id.*

The Commissioner does not challenge these cases. And he also agrees that New York law labels the credits as "income tax credits," and excesses or surpluses as "overpayments" of state income tax for state-tax purposes. But is a state's legal *label* for a state-created right binding on the federal government? Here begins the disagreement. The Maineses contend that New York's tax-law label of these excess EZ Credits as overpayments is a legal interest that binds the Commissioner and us when we analyze their taxability under federal law. The Commissioner warns that if this were true, a state could undermine federal tax law simply by including certain descriptive language in its statute. To use Lincoln's famous example, if New York called a tail a leg, we'd have to conclude that a dog has five legs in New York as a matter of federal law. *See* George W. Julian, "Lincoln and the Proclamation of Emancipation," in *Reminiscences of Abraham Lincoln by Distinguished Men of His Time* (Allen Thorndike Rice, ed., Harper & Bros. Publishers 1909), 227, 242 (1885), *available at* https://archive.org/details/ cu31924012928937.

We have to side with the Commissioner (and Lincoln) on this one: "Calling the tail a leg would not make it a leg." *Id.* Our precedents establish that a particular label given to a legal relationship or transaction under state law is not necessarily controlling for federal tax purposes. *See Morgan*, 309 U.S. at 81; *Patel v. Commissioner*, 138 T.C. 395, 404 (2012). Federal tax law looks instead to the substance (rather than the form) of the legal interests and relationships established by state law. *See United States v. Irvine*, 511 U.S. 224, 238–40 (1994).

Our decision in *Buffalo Wire Works Co. v. Commissioner*, 74 T.C. 925, 936 (1980), *aff'd without published opinion*, 659 F.2d 1058 (2d Cir. 1981), supports this. In *Buffalo Wire Works* we had to determine the character of condemnation payments made by the city of Buffalo to the taxpayer. Under New York law, condemnation awards included compensation for land, building, and fixtures—and a court had to determine the compensation for the value of fixtures by calculating the cost of moving them. *Id.* at 927–28. The IRS argued that this meant that part of the condemnation award was a reimbursement for moving expenses (taxable in the case under the tax-benefit rule because the taxpayer had previously deducted the moving expenses) and not a payment entitled to nonrecognition treatment as an amount that was involuntarily converted into similar property. *See* sec. 1033 (any gain from a condemnation award is not recognized if the money is reinvested in a similar property).

We had to figure out whether the condemnation award for the taxpayer's fixtures "should be treated for purposes of Federal income taxation as reimbursement of moving expenses or as money into which property has been converted." *Buffalo Wire Works*, 74 T.C. at 934. And we concluded that, regardless of state-law labels, the economic reality of the payments showed them to be the latter. *Id.* at 936–37. [10]

We have to draw the same distinction here: The Maineses have a legal *interest* in the giant credits that New York law entitles them to. Those credits were paid to the Maineses, and nothing we say undermines New York's decision to make them. But federal tax law has its own say in how to characterize those payments under the Code. Under New York law, to qualify for the EZ Investment Credit, a taxpayer must own a business that places in service qualified property in a

---

[10] Note that the rest of our opinion in *Buffalo Wire Works* dealt with the tax-benefit rule. We held that because none of the money was actually compensation for moving expenses, the taxpayer did not have a "recovery" of previously deducted moving expenses. *Buffalo Wire Works*, 74 T.C. at 939. This was before the Supreme Court later invalidated the "recovery" test for the tax-benefit rule and replaced it with the "fundamentally inconsistent" test. *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 383 (1983). *Hillsboro* does not affect our analysis in *Buffalo Wire Works* regarding state-law labels for federal tax purposes.

designated Empire Zone. To qualify for the EZ Wage Credit, a taxpayer must own a business that has full-time targeted employees who receive qualified EZ wages. Neither credit is, in substance, a refund of previously paid state taxes deducted under federal law. They are just transfers from New York to the taxpayer—subsidies essentially.

The QEZE Real Property Tax Credit is different. Taxpayers receive a QEZE Real Property Tax Credit only if their business qualifies as a QEZE and pays eligible real-property taxes, and—this is important—the amount of this credit cannot exceed the amount of those taxes actually paid. The refundable portion of this credit is indeed a tax refund—it is in substance a refund of previously paid *property taxes* even if New York labels it a credit against state *income taxes*. And this means that our analysis of the EZ Investment and Wage Credits will be different from our analysis of the QEZE Real Property Tax Credit.

## B. *The EZ Investment and Wage Credits*

Section 61(a) defines gross income as "all income from whatever source derived." Payments that are "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion" are taxable income unless an exclusion applies. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). Section 61 is meant to extend to the full measure of Congress's taxing power, and we have to construe exclusions from income narrowly. *Commissioner v. Schleier*, 515 U.S. 323, 327–28 (1995) (citing *United States v. Burke*, 504 U.S. 229, 248 (1992) (Souter, J., concurring)).

Receipt of tax deductions or credits that just reduce the amount of tax a taxpayer would otherwise owe is not itself a taxable event, "for the investor has received no money or other 'income' within the meaning of the Internal Revenue Code." *Randall v. Loftsgaarden*, 478 U.S. 647, 657 (1986). But what happens when those deductions or credits lead to a state income-tax refund greater than the taxes actually paid? Both parties point us to *Tempel*, where we stated that the amount of a state-tax credit that *reduces* a tax liability is not an accession to wealth under section 61. *Tempel*, 136 T.C. at 351. Both parties agree with this. The parties disagree on what *Tempel* says about refundable portions of

credits. *Tempel* involved the tax treatment of the sale of transferable Colorado state-tax credits that the taxpayers received for a donation of a qualified conservation easement. *Id.* at 342–43. Colorado allowed conservation easement recipients to use their credits to receive a limited refund up to $50,000 provided that the state had exceeded certain Colorado constitutional tax-collection limits. *Id.* at 343. We held that the mere receipt of these credits was not an accession to wealth, but that gain realized from selling them to a third party was capital gain. *Id.* at 349–52.

The opportunity to receive $50,000 under certain circumstances made the credits *potentially* refundable, however, and this creates confusion and disagreement between the parties. The Maineses point to the potential refund and argue that *Tempel* held that the receipt of potentially refundable credits was not income to the taxpayer. This is true, but it misses the issue in this case. In the year in which the taxpayers in *Tempel* received and sold their credits, Colorado made it impossible for them to receive a refund. *Id.* at 349–50 (stating there is no evidence "that petitioners sold credits they could have otherwise used to receive a refund"). We also stated it was "apparent that the transferred State tax credits never represented a right to receive income from the state," while reiterating that credits are not an accession to wealth "as long as they are used to offset or reduce the donor's own State tax responsibility." *Id.* at 351 n.17. Thus, far from suggesting that refunded portions of credits aren't income, we noted that the credits in *Tempel* never led to cash refunds and emphasized that it is only the reduction of tax liability that is not income to the taxpayer.

The Maineses are right that their EZ Investment and Wage Credits are distinct from the credits we discussed in *Tempel*—the Maineses did not receive cash in hand from selling them to a third party. But we don't see much of a difference between the Maineses' Investment and Wage Credits and those Colorado credits that we held taxable in *Tempel*. The key distinction—as we held in *Tempel*—is that a nontaxable credit is one that must be used to "offset or reduce" the taxpayer's tax liability. With refundable portions of tax credits, taxpayers may receive cash payments in *excess* of their tax liability.

We therefore hold that this excess portion that remains after first reducing state-tax liability and that may be refunded is an accession to the Maineses' wealth, and must be included in their federal gross income under section 61 for the year in which they receive the payment or are entitled to receive the payment unless an exclusion applies. *See* secs. 101–140. And there is no exclusion from federal income tax simply because a payment comes from a state government. *See Commissioner v. Kowalski*, 434 U.S. 77, 81–82 (1977) (whether cash payments designated as meal allowances to state police troopers are excludable under section 119); *Taggi v. United States*, 35 F.3d 93, 95 (2d Cir. 1994) (taxpayer "claiming an exclusion from income bears the burden of proving that his claim falls within an exclusionary provision of the Code"); *Dobra v. Commissioner*, 111 T.C. 339, 349 n.16 (1998) (holding taxpayers seeking an exclusion from income must bring themselves "within the clear scope of the exclusion"). There is also no federal exclusion simply because an amount takes the form of a tax refund for state purposes.

It is only the potentially refundable excess credits that must be included in gross income; and under the doctrine of constructive receipt, this is the case whether or not the Maineses elect to receive the excess or carry it forward. The regulations say that even if income is not actually reduced to a taxpayer's possession, it is constructively received by the taxpayer if it is somehow made available to him so that he could draw on it if he wanted. Sec. 1.451–2(a), Income Tax Regs. We have formulated this concept by saying that "a taxpayer recognizes income when the taxpayer has an unqualified, vested right to receive immediate payment." *Martin v. Commissioner*, 96 T.C. 814, 823 (1991). Income is not constructively received if the taxpayer's right to control it is subject to substantial limitations. Sec. 1.451–2(a), Income Tax Regs. Here, there were excess tax credits left after the Maineses reduced their liability; the Maineses had a clear right to receive a percentage of this excess as a direct payment; and there were no limits on the Maineses' ability to receive these payments. We must therefore hold that the Maineses have constructively received income equal to what they could have received as a direct payment even if they in fact chose not to do so.

The Maineses also argue that the excess portion of the refundable state-tax credit is a return of capital and thus not income. *See S. Pac. Co. v. Lowe*, 247 U.S. 330 (1918). The return (or recovery)-of-capital doctrine makes nontaxable the repayment of an initial outlay. (For example, someone who buys stock for $1,000 and sells it for $2,000 pays tax only on the $1,000 gain.) The Maineses cite various revenue rulings and general counsel memoranda in support of their claim, but none of them justifies income exclusion in the present situation. *See* Rev. Rul. 78–194, 1978–1 C.B. 24; Rev. Rul. 70–86, 1970–1 C.B. 23; I.R.S. Gen. Couns. Mem. 38247 (Jan. 16, 1980) (citing I.R.S. Gen. Couns. Mem. 35731 (Mar. 14, 1974)). The revenue rulings and the general counsel memoranda analyze situations where states refunded property taxes or rent payments that had not provided earlier tax benefits. In other words, their facts were just like those of a taxpayer who paid state taxes but didn't itemize and therefore never benefited from the payments.

The general counsel memoranda frame these payments as a "return of capital" rather than a tax refund because some of the recipients were renters and therefore never directly paid property tax; for them, the payments were a refund of rent expenses. I.R.S. Gen. Couns. Mem. 35731. And because rent payments are not deductible, the state refund was not for a previously deducted item and there was no tax-benefit issue. Thus, rather than standing for some escape from the tax-benefit rule, the memoranda clarify that such payments were tax-free returns of capital only because they restored a prior expense that had provided no previous tax benefit. *See id.*

In this case, it's unclear if the Maineses claim the credits are a tax-free return of capital because they are a return of property tax, a return of income tax, or some other return of capital. Their argument fails regardless. The Maineses didn't pay any income tax to New York in 2005, 2006, and 2007. Therefore the credits can't be a "return" of state income tax. They did pay property tax (through Huron), but they also benefited by deducting those payments (through Huron). This means the credits can't be a *tax-free* return of capital. And while the amount of the investment credits takes into account the costs of acquiring and improving real estate (which are undoubtedly "capital" expenses), the authorities

that the Maineses cite involve the return of previously non-deducted property tax and rent payments, and do not suggest that payments like those at issue in this case are also a tax-free "return of capital." This argument is, in any event, also underdeveloped on a summary-judgment motion—neither party presented any evidence, for instance, of whether the Maineses already received some tax benefit (such as depreciation deductions) for their capital outlays on real property.

The Maineses also contend that their credits are excludable from their taxable income as welfare. The Commissioner has long held that certain payments from social-benefit programs that promote the general welfare are not includible in gross income. *See* Rev. Rul. 2005–46, 2005–2 C.B. 120 (certain payments promoting general welfare are excludable, but disaster-relief payments to businesses are not excludable). To qualify for the general-welfare exclusion, a payment must (1) be made from government funds, (2) promote the general welfare (generally based on need), and (3) not be compensation for services. *Id.* Grants from welfare programs that don't require recipients to show need have not qualified for the general-welfare exclusion. *See Bailey v. Commissioner*, 88 T.C. 1293, 1300 (1987) (denying the exclusion for payments from a facade grant program when the taxpayer only had to show ownership and building code compliance to qualify).

Critics of programs like New York's might call them "corporate welfare." But that's just a metaphor—the credits that New York gave to the Maineses were not conditioned on their showing need, which means they do not qualify for exclusion from taxable income under the general-welfare exception. *See also, e.g.*, Rev. Rul. 2005–46 (holding that state grants for expenses incurred by businesses that agree to operate in disaster areas are not excludable under the general-welfare exclusion).

We therefore hold that portions of the excess EZ Investment and Wage Credits that do not just reduce state-tax liability but are actually refundable are taxable income.

## C. *The QEZE Real Property Tax Credit*

The Maineses' QEZE Real Property Tax Credit is different because it was limited to the amount that Huron had actually paid in real-property taxes. As we've already discussed,

the tax-benefit rule and section 111 are what we use to answer this question. Under that rule and that section, a taxpayer is allowed to exclude a refund from his income if, but only if, he never got the benefit of a corresponding deduction for an earlier year.

The parties agree that Huron paid property taxes in 2005–07 and that it deducted these taxes on its federal returns. *See* sec. 164(a)(2). On its Forms 8825 Huron deducted property taxes from its gross receipts to arrive at its net real-estate income. Huron then calculated the Maineses' distributive share of its net real-estate income and reported it to the Maineses on their Schedule K–1. The Maineses reported this amount on their Form 1040 on the line for partnership income. Because Huron had deducted its property tax to calculate its net real-estate income, the amount of net real-estate income passed through to the Maineses was smaller than it would have been had property tax not been deducted. This decreased amount of passthrough income led to a smaller taxable income reported by the Maineses on their individual return, and thus smaller tax liability. This decreased tax liability is a benefit to the Maineses, and their receiving a cash refund of these previously deducted taxes is fundamentally inconsistent with the previous deduction—the distributive share of the passthrough QEZE Real Property Tax Credit that belonged to and was claimed by the Maineses, even though it was Huron that paid the underlying property tax at the entity level. *See supra* note 3. Because the cash refund is fundamentally inconsistent with Huron's previous deduction, the tax-benefit rule applies. This means that any refundable portion of the QEZE Real Property Tax Credit that remained after first reducing the Maineses' state income-tax liability is taxable as income.[11] The exclusionary aspect of the tax-benefit rule under section 111(a) does not apply here to the extent that the decreased pass-through income from Huron reduced the Maineses' federal tax liability.

It is of no consequence that it was Huron that paid and deducted the property taxes while it is the Maineses who are

---

[11] Recall that whether or not the Maineses choose to receive the refundable portion of the credit, they are in constructive receipt of it and therefore must include it in their gross income.

receiving the refundable credit. The Maineses needn't have been the ones that personally claimed the earlier deduction if their tax-free receipt of the credit is fundamentally inconsistent with the earlier tax treatment. In *Frederick v. Commissioner*, 101 T.C. 35, 36 (1993), we faced a similar situation when a C corporation[12] deducted interest expenses before changing to an S corporation and passing through recovered interest expenses to its shareholders. Although the corporation initially claimed the deduction, we held that the tax-benefit rule required inclusion of the recovered expenses by S corporation shareholders because tax-free recovery of those expenses was fundamentally inconsistent with the previous deduction that lowered the corporation's income. *Id.* at 42–43. In reaching this conclusion, we noted that section 111 is not limited to cases where the same person receives both the deduction in the earlier year and the recovery in the later year. *Id.* at 44 n.10.

*An appropriate order will be issued.*

---

[12] Taxation of a C corporation is under subchapter C of the Code. C corporations (which include most large corporations) do pay tax at the corporate level, unlike S corporations.